**FLEET NATIONAL BANK**

**v.**

**ANCHOR MEDIA TELEVISION, INC.,** KOVR of Delaware, Inc., Narragansett Capital, Inc., in its capacity as shareholder representative, Edwin Pfeiffer, Narragansett First Fund, John E. Franks, and The Prudential Insurance Company of America.

Civ. A. No. 89–0353B.

United States District Court,
D. Rhode Island.

June 14, 1993.

Mark J. Kenney, Severson & Werson, San Francisco, CA, Stephen Sachs, Mark A. Kass, Arnold & Porter, Washington, DC, for plaintiff.

Anthony J. Muri, Goldenberg & Muri, Providence, RI, Richard M. Sharfman, Charles I. Poret, Sharfman, Shanman, Poret & Siviglia, New York City, for defendant Anchor Media Television, Inc.

Robert E. Hardman, Providence, RI, for defendant Prudential Ins. Co.

## OPINION

FRANCIS J. BOYLE, Senior District Judge.

This litigation arose out of the sale of KOVR–TV, a Sacramento, California, television station, to Anchor Media Television, Inc. of Delaware and KOVR of Delaware, Inc., collectively referred to as "Anchor." The sellers were Narragansett Television Company of California, Inc. ("NTV"), and its shareholders, Narragansett First Fund ("NFF"),

Edwin Pfeiffer, John E. Franks, and The Prudential Insurance Company of America.

The sale was governed by a merger agreement and an indemnity escrow agreement, which established a $5 million escrow account to deal with claims that might arise from the sale of the television station. After Anchor filed suit in California claiming breach of contract and fraud, Fleet National Bank ("Fleet") filed the present suit as an interpleader action, seeking a determination by this Court as to whom the escrow account money should be paid. Fleet interpleaded Anchor as well as the various Narragansett Cross-defendants.

Anchor filed crossclaims against the Narragansett Cross-defendants seeking $5 million for breach of contractual representations, warranties and covenants under the Merger Agreement and an additional $38 million for fraud. Anchor claimed to have been fraudulently induced to pay too high a price for KOVR. Cross-defendant Edwin Pfeiffer, manager of KOVR, brought a crossclaim against Anchor for breach of his employment contract with Anchor. After a three-week jury trial, the jury returned a verdict for Anchor of $4.5 million on Anchor's breach of contract claims, $14.5 million on Anchor's fraud claims, and $1 million in punitive damages. The jury found for Anchor on Pfeiffer's breach of contract claim.

Cross-defendants have moved for a judgment notwithstanding the verdict under Federal Rule of Civil Procedure 50(b) and, alternatively, for a new trial under Federal Rule of Civil Procedure 59. After careful consideration and for the reasons detailed below, the Court grants Cross-defendants a new trial on Anchor's breach of contract claims and grants Cross-defendants Edwin Pfeiffer and NCI a new trial on Anchor's claim of fraud. The Court also grants Cross-defendants Pfeiffer and NCI a new trial with respect to the jury's award of punitive damages unless Anchor accepts a remittitur of all such damages. The Court denies the remainder of the Narragansett Cross-defendant's motion for judgment n.o.v. or new trial.

## FACTS

Depending upon which parties' version of the story is believed, the $162 million purchase price of KOVR represented either a grossly excessive price caused by blatant misrepresentations on the part of the sellers or a bad deal on the part of a wealthy purchaser who sorely desired a television station in Sacramento, California. The facts, which were vigorously disputed at trial, can be summarized as follows.

Anchor Media is a company that owns and operates several radio and television stations around the country. Its President and Chief Executive Officer is Alan Henry. The Robert M. Bass Group, a company with diversified investments, is the manager shareholder of Anchor Media. Both Anchor Media and the Robert M. Bass Group share ownership in the various media properties that are purchased by Anchor Media.

Anchor Media had unsuccessfully attempted to purchase KOVR as part of a plan to buy television stations in capital cities several years before the sale of KOVR which is at issue in the present litigation. The then-owner of KOVR summarily dismissed Anchor's offer of approximately $95 million for KOVR and instead sold KOVR to NFF for $104 million.

At this juncture, a brief foray into the complex web of the Narragansett Cross-defendants would be helpful. NFF is a limited partnership, formed in 1982, with the Narragansett Management Partners. Narragansett Management Partners contracted with Narragansett Capital, Inc. ("NCI") to perform investment advisory services for NFF. NCI, which was the principle entity managing NFF's investment in KOVR, received a management fee for this service.

Jonathan Nelson, who formed NCI in 1986, served as one of five managing directors of NCI. Nelson also served as Executive Vice President and Co–Chairman of the Board of Directors of NTV, a corporation whose principle asset was KOVR. The shareholders of NTV were NFF, Edwin Pfeiffer, John E. Franks, and The Prudential Insurance Company of America.

At trial, Nelson testified that although it may have appeared to the public as though NCI controlled KOVR, in actuality there was no such control. Nelson, however, had boasted in a 1988 trade press article that by 1990, NCI expected to "control" a diversified media empire, including KOVR. Furthermore, a draft of the press release concerning the sale of KOVR to Anchor sent by Nelson to Alan Henry on October 28, 1988 described NTV as a "unit" of NCI.

According to Nelson, NFF purchased KOVR as a long-term investment of five to seven years. After only two years, however, NFF, on the advice of Nelson, decided to sell KOVR. Nelson testified that he made the decision to sell KOVR in 1988 after receiving an unsolicited offer of approximately $180 million early that year. Prices of television stations had escalated dramatically in the 1980's, and Nelson believed that the onslaught of cable television and the looming recession might decrease the value of KOVR in the future.

Nelson contacted Goldman Sachs to act as a broker in the sale of KOVR. Although Nelson testified that he was acting in his capacity as Director of NTV when he contacted Goldman Sachs, a May 17, 1988 letter from Tom Murphy of Goldman Sachs indicates that Goldman Sachs initially thought it was doing business with NCI. In any case, the final brokerage agreement is between NTV and Goldman Sachs.

Pursuant to that agreement, the sale of KOVR would be accomplished through an auction process. Pfeiffer, the manager of KOVR, provided KOVR's financial information to Goldman Sachs, which eventually sent the information to prospective bidders. Nelson admitted at trial that, by providing this information, Pfeiffer was acting in the interests of the selling shareholders, which were co-extensive with the interests of NCI. Based on the actual financial data from January through June 30, 1988 and projected revenue for the rest of the year, Goldman Sachs estimated that KOVR's profits for the entire year would be $13.638 million.

Alan Henry testified that he learned through trade press articles in early 1988 that KOVR was for sale again and that NTV was looking for a price of $200 million. In August of 1988, Henry received a book from Goldman Sachs describing KOVR. At this time, Anchor remained interested in purchasing television stations in capital cities, such as Sacramento. There was considerable dispute at trial as to whether Robert Bass also desired to purchase KOVR in order to protect his large investment in the America Savings Bank of Stockton, California. David Bonderman, the Chief Operating Officer of the Robert M. Bass Group, first testified that there was no synergy between the bank and the television station, but later changed his testimony after being confronted with his deposition testimony that Mr. Bass sought to purchase KOVR to protect his interest in the bank. Henry, however, denied any such strategy.

In any case, Anchor officials began a due diligence investigation to determine whether to submit a bid on the station. There was considerable testimony at trial as to the extent of this investigation. Larry Clamage, the Senior Vice-President of Anchor, described in detail the steps he took to evaluate the quality of KOVR's programming and the desirability of the Sacramento market. Clamage described meetings with senior personnel at KOVR in which they discussed promotion plans, equipment competition, and news strategy. Clamage also reviewed budget information, program schedules, and other operational material. In assessing the Sacramento market, Clamage read trade publications about the market and spoke to colleagues in the television industry around the country, including an Anchor employee who had formerly worked at a competitor station in Sacramento. Clamage also spoke with presidents of national representative firms that sell advertising time on behalf of local stations. Thus, as Clamage testified, Anchor was "getting a lot of fresh information about what was going on."

Clamage also spoke with Christopher Pike, the station manager of KOVR about commercial activity in general, but did not specifically ask about the amount of time during which KOVR ran commercials. Clamage nevertheless testified that based on his review of information and conversations with KOVR

24

staff concerning revenue projections and business in general, he thought that KOVR was operating the station in the customary manner.

Clamage, however, acknowledged that prior to submitting a bid, neither he nor any other Anchor official asked to see any program logs of KOVR. A program log is an official record certified by an operator on duty of what a station actually broadcasts on a particular day at a particular time. According to Clamage, these logs provide a lot of minutia and fine detail unnecessary in evaluating the quality of a television station. Clamage and Henry, both of whom had been involved in a number of station acquisitions, testified that they had never examined program logs prior to an acquisition.

Anchor's accounting firm, Deloitte, Haskins & Sells, however, did examine a random sampling of program logs in connection with their audit of KOVR's books and records. The accountants' limited review, however, was not meant to uncover overcommercialization or improper programming. Instead, the accountants tested the validity of various records by comparing them with a random sampling of program logs to determine whether an advertisement aired at the time indicated on the records. Patrick Murphy, Anchor's Vice–President of Finance, who had worked for Deloitte, Haskins & Sells as a CPA prior to employment with Anchor, testified that program logs are not in the area of finance review. According to Murphy, Anchor's financial investigation of KOVR confirmed that KOVR was well run.

Larry Clamage also testified that he didn't watch prime time during his two visits to Sacramento in August and October because the network programs prime time. Prime time, therefore, has little relevance to how efficiently a particular network affiliate operates. For a similar reason, Clamage neglected to watch the station at 9:58 p.m. to see if the station was broadcasting the ABC newsbrief. According to Clamage, this brief news teaser ordinarily is carried by every ABC affiliate in the country; therefore, there was no need to watch the newsbrief during his visits to Sacramento.

What both Clamage and Henry did concentrate their investigation on during their visits to Sacramento was the local news, which apparently is a virtual barometer of the quality of a television station. Henry testified that he watched the news at 5 pm on August 16, 1988, in Pfeiffer's office in Sacramento. During this news period, three television sets played the three network stations simultaneously. Based on observations of color, lighting and appearances of anchors, Henry thought that the KOVR news, which had the lowest ranking among the three networks, needed an overhaul. When asked the reason for KOVR's low ranking, Pfeiffer said that it was due to a very competitive market.

During this August 16 viewing of the news, Henry also noticed "clutter," which he defined for the jury as "the refrigerator break, too many commercials." Henry testified that when he asked Pfeiffer at this time how many commercials KOVR ran in the 5 pm news hour, Pfeiffer responded "16." Upon his return to Anchor's headquarters in Florida, Henry, obviously still concerned with the clutter he saw in Sacramento, asked Clamage to get a "snapshot of the station's commercial practices."

In response to Henry's request, on September 23, 1988 Tom Murphy of Goldman Sachs faxed a request to Lila Luna, Pfeiffer's assistant at KOVR, asking for certain information, including information about the level of commercials. Luna gathered the relevant information from Chris Pike and sent it to Goldman Sachs without reviewing it. Goldman Sachs then relayed the information to Henry on that same day.

The information sent to Henry by Goldman Sachs on September 23, 1988, included the allegedly false day part summary. This day part summary reported the number of commercials run by KOVR in July and August of 1988. According to Henry, based on his review of the data in the day part summary prior to submitting a bid, he thought that KOVR was substantially undercommercialized. At trial, both Henry and David Ulrickson, the general sales manager at KOVR since March of 1989, testified that the numbers in the day part summary were false.

There was, however, a great deal of confusion at trial between even Ulrickson and Henry as to the proper method of calculating daily commercial minutes for a particular time period based on the day part summary. Ulrickson testified that the 305 units of commercials in July of 1988 for the 11–11:30 p.m. news period indicated only 4½ or 5 minutes of commercials run per day in this time period. This number of minutes is substantially below the 7 minutes of commercials, which Anchor argued was the norm for this time period.

Henry had several different versions, one which directly contradicted Ulrickson's testimony, as to what the day part summary reflected. Initially, he testified that the 305 units reported for July 1988 equalled about 8 minutes of commercials per day for the 11 p.m. new period, a quantity that does not indicate undercommercialization. He based this calculation on a comparison with a 337 unit figure that appeared in a March 1989 summary of sales by day part for this same 11–11:30 p.m. time period. According to Henry's initial interpretation, the March 1989 day part summary indicated 9 minutes of commercials run in that half-hour news period. Henry, however, later changed his testimony and said that the 337 unit figure for the late news in March of 1989 was based on 30–second units and equalled only 5.4 minutes, and that the 305 unit figure from the July of 1988 day part summary equalled 4.9 minutes. Although the trial record does not bear out this observation, Henry testified that his original calculation was wrong only because he couldn't find the division key on his calculator and the opposing attorney shut him up.

Aside from the confusion as to what the figures in the day part summary of 1988 actually represented, Henry also had difficulty explaining why Anchor was still using the allegedly false 1988 numbers to make comparisons by which to judge how well KOVR was doing in 1989. Henry, however, had never seen the documents that made these comparisons and didn't know whether the 1988 figures reflected funded 30–second commercials.

The September 23, 1988 letter from Goldman Sachs in response to Henry's request for information on commercialization also included actual financial figures through August of 1988, as well as the 1988 pacing report, which forecasted the amount of revenue that KOVR was expected to generate for the remainder of the year. Henry was interested in the pacing information because he was skeptical as to whether KOVR would meet the $13.678 million cash flow figure estimated in the Goldman Sachs book. When Clamage spoke to Pfeiffer about the target cash flow estimate in October, Pfeiffer agreed that the station would not reach the target number.

Based upon information supplied by KOVR through Goldman Sachs, including operating revenue figures and pacing information, Anchor developed its projection of cash flow for KOVR in 1988. According to Anchor's witnesses, this calculation was crucial because Anchor predicated KOVR's purchase price on the basis of the cash flow times a multiplier. Cash flow is the excess cash at the end of the year after all expenses have been deducted. The multiplier is simply a number used to project out the total purchase price based on cash flow.

According to Anchor's witnesses, cash flow is the key determining factor in valuing a television station. Although Cross-defendant Jonathan Nelson testified that he would not use cash flow to determine the purchase price for a television station, he admitted that cash flow would be important information for some purchasers and that many people in the television industry relate cash flow to purchase price. Furthermore, Lila Luna testified that Pfeiffer had asked her to prepare cash flow projections for the year because the station would sell for a certain multiple times cash flow.

In late September of 1988, Anchor was fine-tuning its cash flow numbers, which varied from $11 million to $12.2 million. According to Anchor's witnesses, the final cash flow number utilized in formulating their bid was $11.505 million.

Although cash flow is, to a certain extent, objectively determinable, the determination of a multiplier is a judgement call. Accord-

ing to David Bonderman, the Chief Operating Officer of the Robert M. Bass Group, multipliers in the television industry ranged from 11 to 16 in 1988. Because Sacramento is a long-term growth market in the fastest growing state, Anchor started off in the upper end of the multiple range. Henry also testified that a higher multiplier seemed necessary since the buyers of the last major television station in Buffalo, New York, which has poorer market characteristics than Sacramento, had used a multiple of 13. Anchor then reduced the multiplier to take into account special programming, such as the Super Bowl and political advertising, that may have increased revenue in 1988.

According to Anchor's witnesses, the final multiplier used in formulating their bid for KOVR was 13.6. This number conflicts with a figure that appeared in a March 7, 1990 "Partial Summary of Claim," prepared under Patrick Murphy's direction, which indicates that the multiplier to be used in the lawsuit would be 14.1. Murphy, however, testified that the 14.1 figure had nothing to do with the initial bid and that he prepared it only because he was curious as to what the multiplier would be based on the final bid of $162 million.

This final bid of $162 million is not the result of the $11.505 million cash flow times the multiplier of 13.6, which would yield a bid of about $156 million. Instead, according to Anchor's witnesses, the initial bid scenario of $156 million, based on cash flow times a multiplier, was increased to the final bid of $162 million in several stages. First, Robert Bass authorized Henry to increase the bid by $5 million because Bass liked the Sacramento market and was willing to add $5 million in order to ensure a successful bid. There was also testimony that Bass authorized the additional $5 million in order to protect his interest in the Stockton bank that he was about to acquire.

Anchor thereafter sent a letter to Goldman Sachs on September 28, 1988, containing Anchor's initial bid of $161 million. Because Anchor did not receive an immediate response, Henry sent Tom Murphy of Goldman Sachs a letter with a cut-off date, after which the bid would no longer be valid. By this

action, Henry hoped to "slam dunk the auction process." In other words, Henry hoped to get out of the auction process as quick as possible because auctions can increase the price of a station as potential purchasers bid against one another. Other than that, Henry testified that "slam dunk" had nothing to do with the purchase price of KOVR.

After the Narragansett cross-defendants requested several extensions on Anchor's deadline, Henry sent Goldman Sachs another letter with another cut-off date. About one hour after that deadline passed, Mr. Gensler of Goldman Sachs called Henry and said that the $161 million was inadequate and that the Narragansett cross-defendants would sell the station for $172 million. Henry thereafter offered an additional $1 million to arrive at the final bid of $162 million.

At trial, the Narragansett cross-defendants attempted to attack the credibility of Anchor's version of the development of its bid for KOVR. Specifically, a memo prepared on September 27, 1988, the day before Anchor submitted its initial bid of $161 million, indicates that the "acquisition price" for KOVR was $148 million. Both Larry Clamage and Patrick Murphy, however, testified that $148 million was merely a financing number, representing the amount borrowed in order to purchase the station. According to Clamage, it was only one of several scenarios that Anchor contemplated over the course of several days, and it was not the amount that Anchor proposed to pay for KOVR.

In attacking the veracity of Anchor's story, the Narragansett cross-defendants also introduced portions of David Bonderman's deposition testimony. This deposition indicates that Anchor's bid was increased from the mid $150's to $162 million in three stages: 1) the additional $5 million because of Bass's interest in the Stockton bank; 2) an additional $2 million; and 3) an additional $1 million after the conversation with Mr. Gensler. At trial, however, Bonderman explained that the $2 million was part of a possible earn-out to be included either within the $156 million or the $5 million. This earn-out was contemplated because Henry did not think the $13.638 million cash flow figure in the Goldman Sachs

book was attainable. Bass suggested that Anchor put an earn-out number on it; in other words, if Anchor achieved a cash flow of $13.638 million in 1989, Anchor would pay the Narragansett cross-defendants a $2 million earn-out bonus. Because Henry didn't like the idea, it was abandoned.

In any case, Jonathan Nelson recommended that the Narragansett cross-defendants accept Anchor's bid of $162 million. Apparently, Pfeiffer also thought that the bid should be accepted, because he told Lila Luna that if KOVR did not accept the high bid of what Luna recalled as approximately $165 million, that it would be at least several years before the station would be able to sell for that amount again. Pfeiffer asked Luna to prepare scenarios to justify this position. Pfeiffer also indicated that he was disappointed with the bids, and that he had been looking forward to the sale of the station because he stood to make a lot of money. In fact, $3 or $4 million of the purchase price was distributed to Pfeiffer as a shareholder of NTV.

The Narragansett cross-defendants formally accepted Anchor's final bid of $162 million. Following the suggestion of Goldman Sachs, the sale was structured as a merger. According to the Plan and Agreement of Merger ("Merger Agreement"), dated October 12, 1988, an Anchor subsidiary was merged into the then-owner of KOVR, NTV. As a result, Anchor became the owner of KOVR and its corporate parent, NTV. The purchase price was paid by Anchor to the former shareholders of NTV, with NCI as the designated "Shareholder Representative" for all former shareholders of NTV.

Section 8.2 of the Merger Agreement sets out the Narragansett cross-defendants' basic indemnification obligation. It provides:

[T]he Shareholders, acting through the Shareholder Representative as their agent, shall indemnify and hold harmless Parent, Merger Subsidiary and the Surviving Corporation [Anchor] for any loss, cost, liability, damage and expense ... arising from or in connection with any misrepresentation or breach of a representation, warranty or covenant ... in this Agreement.

The specific representations and warranties that could give rise to this indemnification obligation are set forth in § 4 of the Merger Agreement. Several of the representations in § 4 involve the integrity of KOVR's financial statements and accounting procedures. For example, in § 4.1(d), KOVR represented that the financial statements of KOVR for January through August of 1988 delivered to Anchor "fairly present the financial position, results of operations and changes in the financial position of [KOVR] as of the dates and for the periods indicated." KOVR further represented in § 4.1(j) that the financial records of KOVR had been "maintained in accordance with good business practices."

In § 4.1(f), entitled "Absence of Certain Changes or Events," KOVR warranted that since the date of the unaudited financial statements for the eight month period that ended August 31, 1988, KOVR had not entered into any "commitment, contractual obligation or transaction other than in the ordinary course of business."

The only other representations relevant to this litigation are set out in § 4.1(p). This provision warrants that a disclosure letter provided by KOVR contained an accurate list of contracts to which KOVR was a party. According to § 4.1(p), each of these contracts, including KOVR's network affiliation agreement with ABC, was "in full force and effect and valid and enforceable ... and [KOVR has not] in any material respect breached any term or condition of any of the Contracts."

Several key Anchor officials testified at trial that these representations are particularly important in a short-bid process in which a thorough examination of all a seller's documents would be unwieldy. According to Clamage, "it would have literally [been] impossible to ferret out every tiny detail of the operation of [KOVR] So [sic] what we wanted to have was their assurance as credible, honest businessmen and broadcasters that they were going to run the station in the proper fashion.".

The Merger Agreement also contained covenants as to KOVR's operation of the station after the signing of the Merger

Agreement and prior to Anchor assuming control of the station. In § 5.1(a), KOVR covenanted that it would operate KOVR "only in the usual, regular and ordinary manner and to the extent consistent with such operations, use its best efforts to ... preserve its ... television network affiliations intact...." KOVR further promised in § 5.1(e) to "conduct the business and operations of the Station diligently and in the ordinary course in substantially the same manner as heretofore conducted." KOVR also promised to deliver to Anchor financial statements for the months of September through December of 1988. These financial statements were to be prepared "in accordance with generally accepted accounting principles applied on a basis consistent with prior periods."

Aside from the representations, warranties and covenants in the Merger Agreement, Pfeiffer also signed a separate "Officer's Certificate" on January 25, 1989, certifying that "[a]ll representations and warranties of the Company contained in the [Merger] Agreement were true and correct ..." and that KOVR had "complied in all material respects with all covenants ... under the Agreement."

Section 8.5 of the Merger Agreement establishes an obligation to give notice and engage in dispute resolution in order to recover for claims of damages under § 8.2 of the Agreement. Specifically, § 8.5 provides:

If Parent or the Surviving Corporation (an "Indemnified Party") believes that it has suffered or incurred any Damages ... and if a claim in respect thereof is to be made against the Shareholder Representative (an "Indemnifying Party") under Section 8.2, such Indemnified Party shall give notice within 15 business days thereof to the Indemnifying Party describing such Damages, all with reasonable particularity and containing a reference to the provisions of this Agreement in respect of which such Damages shall have occurred. Promptly after any such notice has been given the parties shall endeavor to resolve any disputes with respect to the matters set forth in such notice to determine whether any Damages which have been claimed are to

be paid ... and, if so, the amount which is to be paid. If the Indemnifying Party and Indemnified Party cannot reach agreement within 30 business days after such notice has been given then ... either party may resort to ... judicial proceedings.

Although § 8.2 of the Merger Agreement grants Anchor rights against the former shareholders of KOVR for breaches of representations, warranties, and covenants, the former shareholders' contractual liability was limited by an Indemnity Escrow Agreement, annexed to the Merger Agreement. In accordance with both agreements, $5 million of the $162 million purchase price, which would otherwise have been paid to the former shareholders upon closing of the sale, was set aside in a special escrow account. The Indemnity Escrow Agreement, dated January 25, 1989, was signed by Anchor, Fleet National Bank ("Fleet"), as escrow agent, and NCI, as shareholder representative. According to this agreement, unless Anchor presented claims to the escrow fund pursuant to the terms of both agreements, Fleet was to disburse one-half of the $5 million to NCI as shareholder representative on July 26, 1989, and the balance on December 26, 1989.

Anchor assumed control of KOVR on January 25, 1989. Not long thereafter, Anchor began to realize that perhaps its cash flow analysis of KOVR had been improperly skewed upward. Sometime in January, Patrick Murphy discovered an addendum to KOVR's 1988 contract with Nielsen Media Research ("Nielsen"). Nielsen is a rating service that monitors audience viewership of a television station. On the last page of KOVR's contract with Nielsen, there is a notation to "see attached letter dated 4/7/88." The letter changed the rate structure of the Nielsen contract to allow for lower payments in 1988 and higher payments in 1989, thereby increasing KOVR's cash flow in 1988 by shifting expenses to 1989. The box of contracts sent by KOVR to Anchor prior to Anchor's bid did not contain this letter. Mr. Murphy, however, could not recall making any effort to obtain this letter prior to January.

In March or April of 1989, the new general manager of KOVR, Michael Fiorelli, noticed that the station was broadcasting local com-

mercials in place of the ABC newsbrief. Anchor reinstated the newsbrief and commenced an investigation to determine if this was a "widespread practice." By reviewing the program logs for 1988, Anchor discovered that KOVR had covered the newsbrief on 304 days in 1988.

According to Anchor's witnesses, covering the newsbrief was a violation of KOVR's ABC Affiliate Agreement. The Affiliate Agreement between NTV and ABC recognizes two categories of programs—"Network Sponsored Programs" and "Network Sustaining Cooperative and Spot Carrier Programs." Network sponsored programs are defined in Article 1, paragraph B.1 as "network programs which contain one or more commercial announcements paid for on behalf of one or more ABC Network advertisers." Under Article II, paragraph C of the Agreement, KOVR was free to accept or reject network sponsored programs offered by the network. Once KOVR decided to accept a program, however, paragraph I(B)(1)(b) required KOVR "to broadcast network sponsored programs in their entirety, including but not limited to the network commercial announcements, network identifications, program promotional material or credit announcements contained in such programs which you accept, without interruption or deletion or addition of any kind." According to Anchor, the ABC newsbrief was part of a network sponsored program, and KOVR was required to broadcast the newsbrief if it accepted the program during which the newsbrief would air.

Clamage testified that an affiliate learns the exact contents of a network sponsored program, all of which it must broadcast once it accepts a program, from the offering twx from the network to the affiliate. The ABC President, Mark Mandala, corroborated this testimony and stated that covering the ABC newsbrief was a violation of ABC policy because "it didn't confirm to the TWX." The TWXs sent by ABC to KOVR in 1988, described the programs accepted by KOVR as, for example, "Moonlighting/ABC Newsbrief." The Court, however, did not permit the actual TWXs to be introduced into evidence be-cause Anchor had failed to include the documents on its pretrial exhibit list.

The Narragansett cross-defendants argued at trial that the ABC newsbrief was a network sustaining program. Paragraph I.B.2 of the Affiliate Agreement states that ABC will from time to time offer the affiliate "live or recorded network programs or spot carrier programs." The Affiliate Agreement, however, does not specifically define "network sustaining program." At trial, Clamage defined a network sustaining program as a program that does not contain commercials, such as a Sunday morning religious program or a Presidential address. Although the newsbrief does not contain commercials, Clamage specifically testified that the newsbrief was not a sustaining program within the meaning of the Affiliate Agreement.

The Narragansett cross-defendants introduced evidence suggesting that the ABC Affiliate Relations Department did not consider covering the ABC newsbrief in 1988 to be a violation of the Affiliate Agreement. ABC kept track of whether its affiliates were broadcasting what they agreed to broadcast by subscribing to BAR Reports. If a BAR Report indicated that a station was not broadcasting what it had agreed to broadcast, the ABC Affiliate Relations Department would investigate and take appropriate action, including talking to the station and eliminating compensation for the period. BAR Reports for 15 of the top 75 ABC affiliates were entered into evidence. These reports indicate that at least 14 stations, including 2 stations owned by Anchor, did "not clear" the ABC newsbrief in 1988. In each instance, the BAR Reports contained a notation indicating that the practice did not constitute a discrepancy. During this time, ABC never notified KOVR that it was violating ABC policies, practices or the Affiliate Agreement by not clearing the newsbrief. In fact, ABC renewed the Affiliation Agreement with KOVR after Anchor assumed control of the station in January 1989.

In addition, a letter dated October 10, 1989, from Kristen Gerlach, Senior Attorney, Law and Regulation for ABC, was admitted into evidence. The Gerlach letter states that "up until five or six months ago a station's

covering the newsbrief with a :30 local commercial was not considered to be a discrepancy requiring action by the District Director (if the clearance report indicated that the station was not carrying the newsbrief). Thus, in the Report covering the week ending 1/31/88, the fact that KOVR–TV did not carry newsbriefs was noted by the Manager, Affiliate Communications, along with the notation 'No discrep.' "

The Gerlach letter also stated that after September, 1987, the ABC newsbrief became a sustaining program. Prior to that time, the newsbrief had contained between 8 and 15 seconds of commercial time. According to Gerlach, "[e]ffective with the new season in September 1987, the newsbrief was reduced from one minute to :30 seconds and became sustaining (i.e., no commercial time was sold within the newsbrief by the network)."

It is precisely this time period, September of 1987, when KOVR began covering the ABC newsbrief with commercials. According to several staff members who testified at trial, Chris Pike first announced that he wanted to cover the newsbrief during a September 23, 1987 meeting. A staff member who had glanced at, but not read the Affiliate Agreement said he thought covering the newsbrief would be a violation of that agreement. According to this staff member, Pfeiffer told him not to worry about it. KOVR thereafter began covering the newsbrief and continued to do so throughout 1988.

At trial, Anchor claimed that KOVR's practice of covering the newsbrief in 1988 produced $493,000 of revenue to which KOVR was not entitled. David Ulrickson, KOVR's general sales manager since March 1989, calculated this number using actual invoices for the commercials that aired in place of the newsbrief in 1988. According to Anchor, the additional revenue derived from covering the newsbrief improperly inflated KOVR's purchase price by $6,704,800, which is equal to $493,000 multiplied by 13.6.

Anchor's post-closing investigation of KOVR's program logs for 1988 also revealed that KOVR had been broadcasting in excess of what Anchor argued was the industry norm for the number of commercials run at particular time periods. According to several Anchor witnesses, these norms were: 14 minutes for the 5–6 p.m. news hour; 7½ minutes for the 11–11:30 p.m. news; 3 thirty-second commercials at the 8 p.m. break; and 3 thirty-second commercials at the 11 p.m. break. Anchor's review of KOVR's program logs revealed that in 1988 KOVR aired an average of 17½ minutes of commercials during the 5–6 p.m. news hour and 9½ minutes of commercials during the 11–11:30 p.m. news period. Furthermore, KOVR exceeded 90 seconds of commercial time at the 8 p.m. break on approximately 280 days and at the 11 p.m. break on 81 days.

Ulrickson testified that this overcommercialization improperly inflated KOVR's revenue by $1,450,000 in 1988. According to Ulrickson, KOVR's overcommercialization during the 5–6 p.m. news program yielded $607,000 of undue revenue, and overcommercialization during the 11–11:30 p.m. news program produced $346,000 of undue revenue. Ulrickson derived these figures by multiplying the number of commercial spots that exceeded the so-called norm by the average rate for the particular time period. Ulrickson determined the average rate by dividing the total amount of revenue for the particular time period by the number of commercials run during that period. Ulrickson testified that he did not consider actual invoices because there was no way to determine when an advertiser purchased particular commercial time, and the date of purchase would determine the commercial rate.

Ulrickson utilized actual invoices, however, to calculate the $352,000 of additional revenue from overcommercialization at the 8 p.m. break and the $115,800 of additional revenue from overcommercialization at the 11 p.m. break. On cross-examination, Ulrickson acknowledged that in actual practice, if he sold four 30–second commercials and was only able to run three, he would drop the lowest priced commercial, because most commercials are preemptable and the station had the right not to run any preemptable commercials. Ulrickson further acknowledged that he easily could have determined which commercial run during each time period was the cheapest. In any case, based upon Ulrickson's calculations, Anchor claimed that

KOVR's overcommercialization during 1988 inflated its cash flow by $1,450,000; thereby causing Anchor to pay $19,720,000.

Anchor's problems with respect to the newly purchased KOVR extended beyond alleged improper inflation of cash flow. After Anchor assumed control, it replaced Pfeiffer with Michael Fiorelli. Pfeiffer was to remain for three months in the role of a consultant. According to his Consulting and Advisory Services Agreement with Anchor, dated January 25, 1989, Pfeiffer was required to devote reasonable efforts and such time as shall be necessary to provide requested advisory and consulting services." Several Anchor officials, however, testified that they were unable to reach Pfeiffer and that he didn't return phone calls. Anchor, therefore, terminated the consulting agreement and withheld payments from Pfeiffer. There was also testimony that Anchor terminated the agreement because it believed that Pfeiffer had breached a separate non-competition agreement.

This non-competition agreement, also dated January 25, 1989, along with an alleged January 20, 1989 oral employment agreement between Anchor and Chris Pike is the subject of a California lawsuit filed by Anchor on March 9, 1989. The California lawsuit named Pfeiffer, Pike, NCI, NFF, and Narragansett Management Partners as defendants. The California action alleged that Anchor was fraudulently induced to enter into the Merger Agreement and further claimed that the Merger Agreement was breached by reason of an alleged conspiracy to cause Pike to quit his new employment with Anchor.

Based upon claims in that lawsuit, on March 20, 1989, Anchor sent notice to NCI as shareholder representative that it was claiming indemnity under § 8 of the Merger Agreement. On May 12, 1989, Anchor sent a letter to Fleet, enclosing a copy of the California complaint and stating that the letter along with the complaint constituted notice of claim to the escrow agent and to the shareholder representative pursuant to § 3(a) of the Indemnity Escrow Agreement. The May 12 letter stated that Anchor was claiming damages in excess of the entire escrow fund and directed Fleet not to release any portion

of the fund. NCI disputed the validity of both of these notices.

In June 1989, Fleet filed the present interpleader action seeking a determination by this Court as to how to disburse the $5 million escrow account. By letter dated August 29, 1989, Anchor gave notice of a claim to the escrow fund, arising from KOVR's covering of the ABC newsbrief. Thereafter, Anchor sent notice, dated September 12, 1989, claiming a breach of the Merger Agreement by virtue of KOVR's alleged overcommercialization. Neither of these notices refer to the provisions of the Merger Agreement that Anchor claims to have been violated.

On August 2, 1990, this Court ordered the parties to interplead their claims for funds held under the Indemnity Escrow Agreement. Anchor did not interplead any of the claims from the California lawsuit. After a three-week jury trial in April of 1991, the jury returned a $4.5 million verdict for Anchor on its breach of contract claim. The jury found Cross-defendants Edwin Pfeiffer and NCI liable for $19 million for fraud and $1 million for punitive damages. The jury rejected Pfeiffer's claim of breach of contract.

*Judgment Notwithstanding the Verdict and Motion for a New Trial*

After the jury returned its verdict for Anchor, Cross-defendants moved for judgment n.o.v. and, in the alternative, for a new trial. The standard governing judgment n.o.v. is restrictive. A district court may grant a motion for judgment n.o.v. if "the evidence could lead a reasonable person to only one conclusion," that the moving party is entitled to judgment. *Conway v. Electro Switch Corp.*, 825 F.2d 593, 598 (1st Cir. 1987). In making this determination, a district court "may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." *Wagenmann v. Adams*, 829 F.2d 196, 200 (1st Cir.1987). The court is compelled, therefore, "to uphold the verdict unless the facts and inferences, when viewed in the light most favorable to the party for whom the jury held, point so strongly and overwhelm-

ingly in favor of the movant that a reasonable jury could not have arrived at this conclusion." *Chedd–Angier Production Co. v. Omni Publications Int'l, Ltd.,* 756 F.2d 930, 934 (1st Cir.1985).

The standard for a new trial motion is also a difficult one to meet. A trial judge may not set aside a jury verdict merely because he or she would have reached a different conclusion. *Coffran v. Hitchcock Clinic, Inc.,* 683 F.2d 5, 6 (1st Cir.), *cert. denied,* 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982). Instead, a trial judge may set aside a verdict and grant a new trial if "the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice." *Borras v. Sea–Land Serv., Inc.,* 586 F.2d 881, 886 (1st Cir.1978) (citation omitted).

Cross-defendants raise a plethora of arguments in support of their motion for judgment n.o.v. or, in the alternative, a new trial. These arguments can be broken down as follows. First, Cross-defendants argue that the Court's missing witness instruction was improper. Second, Cross-defendants argue that Anchor's breach of contract claims should be dismissed based upon its failure to comply with the notice and dispute resolution provisions in the Merger Agreement. Third, Cross-defendants assert that Anchor failed to prove any breach of warranty or covenant. Fourth, Cross-defendants argue that Anchor failed to prove fraud with respect to over-commercialization of the ABC newsbrief. Fifth, Cross-defendants assert that there is no basis to hold NCI and Pfeiffer liable for fraud under alter ego, conspiracy or agency theories. Sixth, Cross-defendants assert that there was no basis for the jury's award of punitive damages. Seventh, Cross-defendants argue that the jury's verdict is irreconcilably inconsistent. Finally, Cross-defendants argue that Pfeiffer is entitled to judgment n.o.v. or, alternatively, to a new trial on his breach of contract claim.

## A. Missing Witness Instruction

Because several key witnesses, including Pfeiffer, Pike, Bass, and Fiorelli, failed to testify at trial, the jury was instructed that it could draw a negative inference from that failure to testify. Cross-defendants object to the missing witness instruction with respect to Pfeiffer because portions of Pfeiffer's deposition were read to the jury. According to Cross-defendants, Pfeiffer was therefore available to both parties and not a missing witness.

Cross-defendants' argument miscomprehends the import of the term "available" under the law regarding missing witnesses. In the First Circuit, a missing witness instruction is permissible if an absent witness is available to the party against whom the negative inference is drawn and the absent witness is "favorably disposed" toward that party. *United States v. Ariza–Ibarra,* 651 F.2d 2, 16 (1st Cir.), *cert. denied,* 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981). There is no basis for a missing witness instruction, however, if the witness is equally available to both parties *and* not favorably disposed toward the nonproducing party. *United States v. St. Michael's Credit Union,* 880 F.2d 579, 597 (1st Cir.1989). Thus, Pfeiffer's availability to Anchor would preclude the jury from drawing an adverse inference against Pfeiffer only if Pfeiffer was not favorably disposed toward himself.[1] The absurdity of this proposition is fairly blatant. It was certainly reasonable for the jury to find that Pfeiffer was both available to testify on his own behalf and that Pfeiffer was "favorably disposed" toward himself. Accordingly, the jury was entitled to draw a negative inference from Pfeiffer's failure to testify at trial.

---

1. In this respect, the jury was instructed erroneously that it could draw a negative inference if: "(A) The witness was under the control of the party and could have been produced by the exercise of reasonable diligence; (B) The witness was not available to the other party; (C) A reasonably prudent person would have produced the witness if the testimony of the witness would be favor- able; and (D) No satisfactory excuse has been given for the failure to produce the witness." Any error in the instruction, however, is harmless because it would favor Pfeiffer by requiring the jury to find that the witness was not available to Anchor in order to draw a negative inference against Pfeiffer.

## B. Notice and Dispute Resolution

■ The Narragansett cross-defendants urge the Court to dismiss Anchor's breach of contract claims based upon Anchor's alleged failure to comply with the notice and dispute resolution provisions of the Merger Agreement. Anchor was required to notify NCI of any claims to the escrow fund within fifteen business days after it "believes it has suffered or incurred any Damages" as a result of any breach of the Merger Agreement. Anchor was also required to describe the damage, the amount of damage, if known, the method of damage computation, and the provision of the Merger Agreement that was violated.

The evidence is that Anchor first filed suit in California Superior Court on March 9, 1989, without giving notice. On March 20, 1989, Anchor gave notice to NCI of a claim to the escrow fund based on allegations in the California lawsuit. The Narragansett cross-defendants urge that this notice was defective because Anchor filed suit prior to giving such notice. The Cross-defendants therefore argue that at least with respect to one-half of the escrow fund, which should have been disbursed on July 26, 1989, the jury's verdict must be overturned.

The California lawsuit, however, did not involve claims with respect to the ABC newsbrief and overcommercialization that are asserted in the present litigation. Instead, the California suit revolved around Chris Pike's employment with Anchor as well as various other alleged breaches of the Merger Agreement. Because the California action did not involve the specific claims at issue in this lawsuit, any defects in notice for the California action have no relevance to the present action.

■ The Narragansett cross-defendants next argue that a jury could not have reasonably found that Anchor notified NCI of any claims to the escrow fund within fifteen business days after it believed it had suffered damages as a result of any breach of the Merger Agreement. There is no dispute that Anchor discovered the covers of the ABC newsbrief and the overcommercialization in March or April of 1989. Nonetheless, Anchor gave no notice of claims regarding the ABC newsbrief and overcommercialization until August and September, months later. According to Cross-defendants, this lapse of several months is proof that Anchor's notice was untimely.

Section 8.5 of the Merger Agreement, however, does not set forth an objective standard requiring Anchor to provide notice when it discovers facts that may give rise to a violation of the Merger Agreement. To the contrary, § 8.5 sets forth a subjective standard and expressly states that, before any obligation to provide notice arises, Anchor must "believe" that it has suffered "damages." The jury could have reasonably found that Anchor's knowledge in the spring of 1989 of KOVR's covers of the ABC newsbrief and overcommercialization did not amount to a belief by Anchor that a breach of representation or covenant caused it to suffer a monetary loss.

There was substantial evidence at trial that, upon learning of these practices, Anchor commenced a detailed investigation to determine their pervasiveness. According to Anchor, this investigation involved reviewing every program log from 1988, totalling over 23,000 pages of logs. Cross-defendants attack the veracity of this story, particularly with respect to the covering of the ABC newsbrief, which appears on one page from each day's logs. Although this Court may find Cross-defendants' argument somewhat persuasive, the jury was entitled to find credible the testimony of the Anchor witnesses that Anchor did not come to a "belief" that it incurred "damages" with respect to the ABC newsbrief until August and with respect to overcommercialization until September.

■ The issues of the form of Anchor's notice and Anchor's failure to engage in dispute resolution are more troublesome. Anchor's August and September notices did not describe the provisions of the Merger Agreement that were allegedly violated, as required by § 8.5 of the Merger Agreement. Moreover, there is no evidence that Anchor attempted to resolve any dispute over matters contained in the notices for thirty days after the notices were issued, as required by § 8.5. The jury, however, could have reason-

ably found that Anchor's failure to follow the precise contours of the requirements in § 8.5 were "slight or unimportant omissions" [2] and not a material breach of the Merger Agreement, when viewed in the context of Anchor's total obligations under the Agreement.

In sum, although it is clear that Anchor's compliance with § 8.5 of the Merger Agreement is far from perfect, a jury could have reasonably found that Anchor substantially performed its obligations under the Merger Agreement. Moreover, the jury verdict on this issue was not against the clear weight of the evidence and will not result in manifest injustice. Thus, there is an insufficient basis to grant either judgment n.o.v. or a new trial on this issue. *See Payton v. Abbott Labs,* 780 F.2d 147, 153 (1st Cir.1985) (a trial judge may not act as a thirteenth juror and set aside a verdict merely because he or she would have reached a different conclusion).

C. Breach of Representations, Warranties, and Covenants in the Merger Agreement

Three claims of breach of representations, warranties and covenants went to the jury. First, Anchor claimed that Cross-defendants breached the Merger Agreement by covering the ABC newsbrief with local commercials. Second, Anchor claimed that the Merger Agreement was violated because KOVR ran too many commercials in contravention of customary broadcasting practice. Third, Anchor alleged that Cross-defendants violated the Merger Agreement by not disclosing an addendum to a contract with Nielsen ratings service.[3]

■ In order to recover for breach of representation, a party must prove: 1) that the representation was material; 2) that the material representation was false; 3) that the representation was made to induce the party to enter into the contract; 4) that the party justifiably relied on the representation; and

5) that the party suffered damages as a result of its reliance on the false representation. *See Norton v. Poplos,* 443 A.2d 1, 6 (Del.Supr.1982).

■ With respect to the covers of the ABC newsbrief, Anchor claimed that Cross-defendants violated the representation in § 4.1(p) of the Merger Agreement that KOVR had not in any material respect breached any term or condition of the ABC Affiliate Agreement. Cross-defendants, however, assert that covering the ABC newsbrief with local commercials in 1988 was not a violation of the ABC Affiliate Agreement. Cross-defendants first urge that the Court should have construed the ABC Affiliate Agreement as a matter of law. According to Cross-defendants, the Affiliate Agreement is a contract of adhesion that should be construed against ABC, the party who drafted it. The fallacy of this argument is fairly obvious. ABC is not a party to this action. There is no general rule requiring a court to construe a contract of adhesion against a nonparty to the contract, such as Anchor.

■ The ABC Affiliate Agreement, which provides that it is to be governed by New York law, does not define whether an ABC newsbrief is part of a network sponsored program, in which case it must be broadcast once an affiliate accepts the program, or whether it is a network sustaining program. Where, as here, terms are not defined in a contract, it is for the jury to determine whether there has been a breach of contract. *See, e.g., Fashion House, Inc. v. K mart Corp.,* 892 F.2d 1076, 1083 (1st Cir.1989).

■ There was sufficient evidence for a jury to find that covering the ABC newsbrief with commercials was a breach of the ABC Affiliate Agreement and, therefore, that the representation in the Merger Agreement that KOVR had not breached the ABC Affiliate Agreement was false. Both Larry Clam-

---

**2.** The jury was instructed that "[a] contract is substantially performed if the only variances from a strict or literal compliance with the terms of the contract are slight or unimportant omissions. It is not necessary that a party show that it performed every minute particular of its contract; it need only show that it has substantially performed its duties and obligations."

**3.** For the discussion of Anchor's breach of representation claim regarding the failure to disclose the addendum to the Nielsen contract, see Section C, at 63–65.

age, a man with considerable experience operating ABC affiliates, and Mark Mandala, the President of ABC, testified that an affiliate learns the exact content of a network sponsored program, all of which it was required to broadcast, from the offering twx from the network to the affiliate. Both witnesses further testified that based on the offering twx from ABC, the ABC newsbrief was part of the 9:00, 9:00 or 9–11:00 p.m. network sponsored program. Accordingly, KOVR, by agreeing to broadcast that ABC program, was obligated under the ABC affiliate agreement to broadcast the 9:58 pm newsbrief. Mr. Mandala further testified that it was a "serious violation" of ABC policy and practice to broadcast local commercials in place of the ABC newsbrief.

Cross-defendants argue, in effect, that the BAR Reports and the Gerlach letter are conclusive evidence that in 1988 the ABC newsbrief was a network sustaining program, which KOVR was free to cover with commercials. The BAR Reports indicate that ABC did not consider there to be a discrepancy when KOVR covered the newsbrief as long as KOVR said that it was not going to carry the newsbrief.[4] The Gerlach letter, written by a Senior Attorney for ABC, confirms this interpretation. Moreover, the Gerlach letter expressly states that in 1988 the ABC newsbrief was a network sustaining program. Cross-defendants also point out that Larry Clamage testified that a network sustaining program is one which contains no commercials, and the ABC newsbrief contains no commercials.

Although this Court deciding the matter de novo might agree with Cross-defendants' interpretation of the ABC Affiliate Agreement, the evidence is not so substantial as to require the Court to grant a judgment n.o.v. or a new trial. Several of Anchor's witnesses, including the President of ABC, testified that the ABC newsbrief was part of a network sponsored program. Thus, there was ample basis in the record for the jury to

reject Cross-defendants' arguments concerning the BAR Reports and the Gerlach letter and conclude that Cross-defendants made false representations concerning their compliance with the ABC Affiliate Agreement. *See Putnam Resources v. Pateman,* 757 F.Supp. 157, 162 (D.R.I.1991) ("[j]uries are peculiarly adept at assessing the weight to be given to testimony."), *aff'd in part, rev'd in part,* 958 F.2d 448 (1st Cir.1992).

There was also sufficient evidence for a jury to find that the representation in the Merger Agreement concerning KOVR's compliance with the ABC Affiliate Agreement was material, that it induced Anchor to execute the contract, and that Anchor's reliance on the representation was justified. Anchor officials specifically testified to the importance of the representations in the Merger Agreement in the context of a short-bid process. According to David Bonderman, the warranty as to compliance with contracts was particularly important because KOVR's relationship with the network is critical in ensuring KOVR's success.

Furthermore, under Delaware law, there is no affirmative duty to investigate the truth of a statement made by a party to a contract. *See Joseph Bancroft & Sons Co., Inc. v. Development Corp.,* 1990 WL 63825 *2 1990 Del.Super. LEXIS 169, at 4 (May 2, 1990). Thus, the jury was entitled to find that Anchor justifiably relied on the representation in the Merger Agreement as long as the falsity of the representation should not have been obvious to Anchor. Cross-defendants stridently argue that Anchor should have been aware of KOVR's covers of the ABC newsbrief because the covers were clearly marked in the program logs and further broadcast to hundreds of thousands of viewers every night. Although there is some logical appeal to Cross-defendants' argument, the jury was entitled to believe Anchor's witnesses, who testified that review of the substantive content of program logs and

---

4. Cross-defendants argue that the existence of these reports rendered Mr. Mandala's lay opinions inadmissible because he had not seen them. Cross-defendants did not, however, offer evidence on whether, for example, the BAR Reports were of sufficient importance that Mr. Mandala

should have been aware of them, or whether they were inconsequential reports within ABC to which ABC and Mr. Mandala gave little weight. The jury was in the best position to assess Mr. Mandala's experience and the basis for his statements.

viewing of prime time television are not a normal part of due diligence in purchasing a television station. As such, KOVR's covering of the ABC newsbrief should not have been obvious to Anchor, and the jury was entitled to find that Anchor's reliance of the representation in the Merger Agreement concerning compliance with the ABC Affiliate Agreement was justifiable.

There was also sufficient evidence for a jury to find that Anchor was damaged as a result of the breach of representation in the Merger Agreement regarding compliance with the ABC Affiliate Agreement. There is no dispute that ABC never withheld any compensation from Anchor despite the fact that KOVR had allegedly breached the Affiliate Agreement in 1988. In fact, ABC renewed the Affiliate Agreement with Anchor in 1989 at the exact same rate of compensation paid to NTV. Accordingly, Cross-defendants argue that Anchor did not suffer any damage of the kind that would proximately result from a breach of the ABC Affiliate Agreement.

Anchor's damages, however, arose not from its relationship with ABC, but from the direct impact the misrepresentation concerning compliance with the ABC Affiliate Agreement had on the amount Anchor paid for KOVR. The jury was entitled to find that broadcasting local commercials in place of the ABC newsbrief produced additional revenue to which KOVR was not entitled. This additional revenue caused Anchor to pay $6,704,800 more for the television station than it otherwise would have paid. There was sufficient evidence, therefore, for the jury to find that these damages proximately flowed from the alleged breach of the ABC Affiliate Agreement.

■ Cross-defendants next argue that Anchor did not sufficiently prove its damages because Anchor did not demonstrate that it could not achieve KOVR's cash flow through legitimate practices. Cross-defendants point out that KOVR broadcast its own local newsbrief at approximately 10:30 p.m. each night.

Cross-defendants therefore argue that KOVR could have eliminated the 10:30 p.m. local newsbrief and shifted the commercials it aired at 9:58 p.m. to that later time period, thereby achieving the same cash flow. The jury, however, was not instructed that Anchor had any duty to mitigate its damages.[5] Nor did Cross-defendants request any such instruction. Accordingly, the jury was entitled to find that Anchor's damages flowed naturally from the breach of representation in the Merger Agreement without considering whether Anchor could have achieved the same cash flow by broadcasting commercials at a different time.

In sum, there was sufficient evidence for a jury to find that Cross-defendants breached their representation in the Merger Agreement concerning compliance with the ABC Affiliate Agreement, that this representation was material and induced Anchor to enter the Merger Agreement, that Anchor's reliance on the representation was justifiable, and that Anchor was damaged thereby.

With respect to the overcommercialization contract claim, the evidence is sufficient for the jury to conclude that KOVR did, in fact, run more commercials than most stations. The evidence indicated that, on average, KOVR broadcast 3 minutes more than the industry norm during the 5–6 p.m. news hour; 2 minutes more than the industry norm during the 11–11:30 p.m. news period; and 30 seconds more than the industry norm at both the 8 p.m. and the 11 p.m. breaks.

The problem with Anchor's claim, however, is that there are no warranties or covenants in the Merger Agreement regarding the number of commercials KOVR had broadcast. Anchor stridently points to several covenants and warranties purportedly promising that KOVR was broadcasting the customary number of commercials in the industry. Those provisions under which the jury was instructed are as follows:

## BREACH OF REPRESENTATION
## THE REPRESENTATION THAT THE
## FINANCIAL STATEMENTS OF KOVR

**5.** The jury was instructed that "the damages which the injured party may recover are those that may be fairly and reasonably considered as arising naturally from such breach, that is, according to the natural course of things, or those damages reasonably contemplated by the parties at the time they made the contract, as the probable result of the breach."

FOR JAN. TO AUG. 1988 DELIVERED TO ANCHOR FAIRLY PRESENTED THE FINANCIAL CONDITION OF THE STATION.

THE REPRESENTATION THAT, SINCE AUGUST 1988, KOVR HAD NOT ENTERED INTO ANY CONTRACTUAL OBLIGATION OR TRANSACTION OTHER THAN IN THE ORDINARY COURSE OF ITS BUSINESS.

THE REPRESENTATION THAT THE FINANCIAL RECORDS OF KOVR HAD BEEN MAINTAINED IN ACCORD WITH GOOD BUSINESS PRACTICES.

### BREACH OF COVENANTS

THAT KOVR WAS TO BE OPERATED ONLY IN THE USUAL, REGULAR AND ORDINARY MANNER.

THAT KOVR WAS TO BE OPERATED DILIGENTLY AND IN THE ORDINARY COURSE IN SUBSTANTIALLY THE SAME MANNER AS HERETOFORE CONDUCTED.

THAT KOVR WAS TO DELIVER TO ANCHOR MEDIA FINANCIAL STATEMENTS FOR THE MONTHS OF SEPTEMBER TO DECEMBER, 1988 AND THAT THOSE FINANCIAL STATEMENTS WERE TO BE PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES APPLIED ON A BASIS CONSISTENT WITH PRIOR PERIODS.

There is no evidence of any problems with the financial statements or the accounting practices. Nor is there any evidence that the station was not operated diligently. Anchor's claim is just the opposite: that KOVR was too diligent in soliciting and running commercials. Moreover, no evidence supports the contention that any of KOVR's commercial practices changed during the interim period covered by the covenants. Anchor's only plausible claim of a representation regarding the level of commercials involves the warranty in § 4.1(f) of the Merger Agreement that the station had been operated in the ordinary course of business.

The operation of a business in the "ordinary course" is a common legal phrase. It is used, for example, in the bankruptcy code, 11 U.S.C. § 547(c)(2), to exclude avoidable transfers, and in the Uniform Commercial Code §§ 1–102, 9–307 to allow a buyer in the ordinary course to take free of certain security interests. In general, a transaction is outside the ordinary course of business if it is a transaction of an unusual type for the business involved, or a transfer of substantially all the assets, or an unreasonably high salary paid to a corporate executive. Certain dividend payments, sales of stock, and fundamental corporate changes are also transactions which may be outside the ordinary course of business.

The applicable provision of the Merger Agreement, § 4.1(f), lists just those types of transactions. This enumeration as well as the title of this provision, "Absence of Certain Changes or Events," indicate that the provision was intended to protect Anchor from actions by KOVR's former owners which would unduly dissipate assets or alter the capital structure of the corporation. *See Woonsocket Teachers' Guild Local 951 v. School Committee of Woonsocket*, 117 R.I. 373, 367 A.2d 203, 207 (R.I.1976) (placement of clause in one section as opposed to another may be evidence of its intended meaning). The selling of commercial air time by a television station, however, is neither unusual nor a major corporate decision involving expenditure of substantial assets. The fact that KOVR sold and aired more commercials than the industry norm does not take these transactions out of the ordinary course of business. In no way was the station's assets depleted or the capital structure affected by selling more commercials than the industry custom.

Accordingly, the issue of overcommercialization, insofar as the Merger Agreement is concerned, should not have gone to the jury. Cross-defendants properly preserved this issue by timely objection. In the First Circuit as well as almost every other circuit, when a trial court erroneously submits one of two or more issues to the jury, a general verdict cannot stand because it is impossible to determine if the jury relied on the improper elements. *Brochu v. Ortho Pharmaceutical Corp.*, 642 F.2d 652, 662 (1st

Cir.1981); *Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*, 370 U.S. 19, 29–30, 82 S.Ct. 1130, 1135–36, 8 L.Ed.2d 305 (1962); *Farrell v. Klein Tools, Inc.*, 866 F.2d 1294, 1299 (10th Cir.1989); *Mark Seitman & Associates, Inc. v. R.J. Reynolds Tobacco Co.*, 837 F.2d 1527, 1532 (11th Cir.1988); *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 971 (2d Cir.1987); *Bone v. Refco, Inc.*, 774 F.2d 235, 242 (8th Cir.1985); *Jones v. Miles*, 656 F.2d 103, 106 (5th Cir.1981).

■ The First Circuit has created a narrow harmless error exception for cases in which the elements necessary to establish one theory of liability are a subset of the elements necessary to establish another theory of liability. *See Shepp v. Uehlinger*, 775 F.2d 452, 456–57 (1st Cir.1985); *Brochu*, 642 F.2d at 662. That exception is inapplicable here where the three breach of contract claims involve separate misrepresentations or covenants. *See Katara*, 835 F.2d at 971 (general verdict for fraud cannot stand if evidence is insufficient to support one of two claimed misrepresentations); *Nelson v. Production Credit Assoc. of the Midlands*, 729 F.Supp. 677, 690 (D.Neb.1989) (new trial is required if evidence is insufficient to support one of several misrepresentations), *aff'd*, 930 F.2d 599 (8th Cir.), *cert. denied*, —— U.S. ——; 112 S.Ct. 417, 116 L.Ed.2d 438 (1991). Since there is no way to sort out which damages, if any, the jury awarded Anchor on its overcommercialization claim, Cross-defendants are entitled to a new trial on Anchor's claims of breach of representation, warranty and covenant.

## D. Fraud

■ Cross-defendants object to the jury's findings of fraud with respect to overcommercialization, the ABC newsbrief, and the Nielsen contract. Before analyzing Cross-defendants' arguments, it is necessary to clarify what state's law governs Anchor's claims of fraud. In their briefs on the present motions, Cross-defendants cite to Rhode Island, Delaware, and New York law, depending upon which state's law favors their position. In their motion to dismiss, however, Cross-defendants persuasively argued that Rhode Island's interest-weighing ap-

proach to choice-of-law issues would lead to the application of Rhode Island law to Anchor's claims of fraud. Cross-defendants, therefore, are bound by that choice, and the Court will apply Rhode Island law to Anchor's fraud claims. *See Putnam Resources, v. Pateman*, 958 F.2d 448, 467 (1st Cir.1992); *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 375 (1st Cir.1991) ("a litigant is bound by a plausible choice of law which it successfully urged the trial court to follow").

■ Cross-defendants argue that Anchor's claims for fraud in excess of the escrow amount are barred because Anchor elected to pursue its contractual claim, thereby affirming the contract, obtaining a remedy under the contract, and waiving its once held right to sue for fraud. This argument has no merit. It is clearly established that a party who has been induced by fraud to enter a contract may either rescind the contract or affirm the contract and sue for fraud. *Ostalkiewicz v. Guardian Alarm*, 520 A.2d 563, 565–66 (R.I.1987); *Halpert v. Rosenthal*, 107 R.I. 406, 267 A.2d 730, 733 (1970). Here, Anchor has not sought to affirm certain provisions of the Merger Agreement and deny others. Instead, Anchor has exercised its right to affirm the contract and sue for damages in fraud.

■ Under Rhode Island law, in order to recover for fraud a plaintiff must prove by a preponderance of the evidence that the defendant knowingly misrepresented a material fact with the intent to deceive, thereby inducing the plaintiff to rely justifiably on such misrepresentation to the plaintiff's detriment. *East Providence Loan Co. v. Ernest*, 103 R.I. 259, 263, 236 A.2d 639 (1968).

### 1. Material False Representations

■ Turning first to the overcommercialization claim against Pfeiffer, there was evidence that Pfeiffer made oral representations to Anchor executives about KOVR's commercial practices that turned out to be untrue. Larry Clamage testified that he had an understanding from a discussion with Pfeiffer that KOVR's commercial practices were "customary." As previously explained, however, KOVR broadcast in excess of the indus-

try norm during several specific time periods. Furthermore, Pfeiffer told Alan Henry that KOVR ran 16 minutes of commercials during the 5–6 p.m. news, when in fact KOVR broadcast an average of 17½ minutes of commercials during this period.

■ There was also evidence to support a jury finding that Pfeiffer made a false representation to Anchor concerning the ABC Affiliate Agreement and the Nielsen contract. In an "Officer's Certificate" signed on January 25, 1989, Pfeiffer certified that all representations and warranties in the Merger Agreement were true and correct. It is this representation that Anchor claims was fraudulent. As stated previously, the jury could have reasonably found that NTV breached its representation that it had not violated the ABC Affiliate Agreement and its representation that it had provided Anchor with a complete list of all contracts to which it had been a party. Therefore, Pfeiffer's statement that all representations in the Merger Agreement were true could itself be found to be untrue.

Furthermore, as explained previously, the representations concerning commercialization, the ABC Affiliate Agreement, and the Nielsen contract were material to Anchor in that they played a part in Anchor's decision to purchase KOVR.

### 2. *Intent*

With respect to the element of fraudulent intent, there was sufficient evidence to permit a jury to find that Pfeiffer knew the representations about commercial load were false, and that he intended to deceive Anchor. The evidence at trial indicated that: 1) Pfeiffer, as a shareholder of NTV, stood to gain financially from a higher purchase price; 2) when Pfeiffer knew Clamage was in Sacramento on August 16 and October 5, 1988, KOVR may not have overcommercialized the 8 p.m. and 11 p.m. station breaks; 3) KOVR did not engage in overcommercialization during ratings sweeps periods; and 4) Pfeiffer may have been aware of the allegedly false daypart summary.

■ Cross-defendants urge the Court that the evidence of intent at trial amounted to nothing more than mere speculation and

conjecture. They contend that there were no 8 p.m. and 11 p.m. breaks on August 16 and October 5 because of special programming. The evidence, however, is unclear on this point, and the jury was entitled to find that there were "floating" 8 and 11 p.m. breaks that were not overcommercialized. Regardless of whether these breaks were overcommercialized, Cross-defendants argue that it is incredible to acknowledge that KOVR broadcast commercials in excess of the industry norm during the local news periods, which were expected to be viewed by Anchor executives on August 16th, yet argue that Pfeiffer attempted to deceive Anchor by adhering to industry norms during the 8 p.m. and 11 p.m. breaks, which Anchor admitted are time periods its executives would not normally have watched because they consist only of network prime time programming. Furthermore, it is farfetched to infer scienter and intent to deceive from KOVR's adherence to industry norms at the 11 p.m. break on the nights that Anchor executives were in Sacramento, since KOVR adhered to industry norms for that particular time period on over 270 days in 1988. Although this Court might find some logic in Cross-defendants' argument were it deciding the matter de novo, the jury was entitled to consider KOVR's adherence to the industry norm for commercial time on August 16 and October 5, 1988, as evidence of scienter and intent to deceive on the part of Pfeiffer. *See Borden*, 935 F.2d at 382–83 ("given a choice among various plausible alternatives, one or more of which could sustain a liability finding, the jury was the appropriate arbiter of the fraud count").

■ Cross-defendants next argue that intent to deceive on the part of Pfeiffer cannot be inferred from the allegedly false daypart summary because there is no evidence connecting the daypart summary to Pfeiffer. Henry testified that after he watched television with Pfeiffer on August 16, 1988 and noticed clutter, he told Clamage to get a snapshot of KOVR's commercial practices. However, Goldman Sachs did not request the daypart summary from NTV until September 23, and that request was directed to Lila Luna, who testified that she requested the information either from Christopher Pike or

his secretary. Anchor's argument that the jury could infer scienter from Pfeiffer's awareness of Henry's concern about clutter and Pfeiffer's general responsibility to gather material for Goldman Sachs is indeed speculative. There is no evidence that Pfeiffer was aware of the daypart summary, let alone that the summary may have been false.

■ There is no question, however, that Pfeiffer, as a shareholder of NTV, stood to gain from a higher purchase price for KOVR. Although a motive to profit is not a necessary prerequisite to a finding of scienter and intent to deceive, the jury was entitled to consider Pfeiffer's incentive to try and pump up the purchase price as circumstantial evidence of intent to deceive. See Fricke v. Fricke, 491 A.2d 990, 994 (R.I.1985) (intent to deceive can be established through circumstantial evidence).

■ Rarely do perpetrators of fraud announce to the world that by their actions they intend to deceive. Courts therefore should be wary of reversing a jury finding of intent. Accordingly, although Anchor's evidence of knowledge of falsity and intent to deceive is indeed very slim, it is sufficient to support a jury finding of fraud on the over-commercialization claim against Pfeiffer, particularly when the evidence is combined with an adverse inference that the jury was entitled to draw from Pfeiffer's and Pike's failure to testify.

■ Similarly, there is sufficient evidence to support a jury finding of intent to deceive with respect to the covers of the ABC newsbrief. In the January 25, 1989 Officer's Certificate, Pfeiffer warranted that all the representations in the Merger Agreement, including the representation that KOVR was in compliance with the ABC Affiliate Agreement, were true. The evidence at trial, however, indicated that Pfeiffer knew as early as September of 1987 that covering the ABC newsbrief with local commercials may have been a violation of the ABC Affiliate Agreement. Combined with Pfeiffer's incentive to inflate KOVR's cash flow, Pfeiffer's knowledge that the covers violated the ABC Affiliate Agreement constitutes sufficient evidence

for a reasonable jury to find intent to deceive.

■ Evidence of intent to deceive on the part of Pfeiffer with respect to the Nielsen contract is a bit more scant. Pfeiffer warranted as true the representation in the Merger Agreement that the disclosure letter provided an accurate and complete list of all contracts to which NTV was a party. As discussed previously, the jury could have reasonably found this to be false because an addendum to the Nielsen contract that changed the basic rate structure of the contract was not listed in the disclosure letter. Although there is no evidence indicating that Pfeiffer knew that this representation was false, the jury could have reasonably found that Pfeiffer recklessly represented that the warranty in the Merger Agreement was true without regard to its truth or falsity. This may seem a slim reed upon which to find intent to deceive, but when combined with Pfeiffer's incentive to inflate the purchase price of KOVR and the negative inference that the jury was entitled to draw from Pfeiffer's failure to testify, the evidence is sufficient to support a jury finding of intent to deceive with respect to the Nielsen contract.

■ Cross-defendants make one final argument with regard to intent to deceive on all three claimed misrepresentations. Cross-defendants contend that there can be no finding of intent to deceive as a matter of law when everything that Anchor claims was misrepresented or hidden from it was openly and accurately available to Anchor in the form of program logs, financial records, and actual broadcasts over public airwaves to hundreds of thousands of people. As support for this proposition, Cross-defendants cite to several Rhode Island cases holding that there can be no intent to deceive in a fraud case grounded in intentional concealment when everything is done openly and without any attempt of concealment. See Jamestown Bridge Comm'n v. American Employers' Ins. Co., 85 R.I. 146, 128 A.2d 550, 552 (1957) (no intent to wrongfully deprive employer of property if employee openly directed that his salary be made out in the amount paid his predecessor), adhered to, 85 R.I. 146, 129 A.2d 542 (1957); In re DiMarti-

*no*, 108 B.R. 394, 400–01 (D.R.I.1989) (insufficient evidence of intent to conceal unfinished status of property if defendant gave plaintiff directions to the property). These cases, however, have no relevance to a case of fraud grounded in affirmative misrepresentations. Accordingly, in the present case, which is based upon affirmative misrepresentations, the jury was entitled to find an intent to deceive irrespective of the fact that Pfeiffer did not attempt to conceal relevant information.

### 3. *Reliance*

Cross-defendants next assert that with respect to the newsbrief and overcommercialization issues, Anchor, as a matter of law, could not claim justifiable reliance when the true facts appeared in KOVR's program logs, which were fully available for Anchor to inspect over a several month period, and were broadcast everyday to everyone in KOVR's broadcast area. Not surprisingly, Cross-defendants cite to cases outside of Rhode Island for this proposition. *See Shappirio v. Goldberg*, 192 U.S. 232, 241–42, 24 S.Ct. 259, 261, 48 L.Ed. 419 (1904) (reliance is not justifiable if "means of knowledge are open and at hand ... and no effort is made to prevent the party from using them"); *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.*, 748 F.2d 729, 737–38 (2d Cir.1984) (where "sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access", there can be no claim of justifiable reliance).

 In Rhode Island, however, the law is contrary. The Rhode Island Supreme Court has repeatedly permitted victims of intentional misrepresentation to recover even though they failed to make any investigation into the truth or falsity of statements made to them. *See Halpert*, 267 A.2d at 737 n. 2; *East Providence Loan Co.*, 103 R.I. 259, 236 A.2d at 642; *Passarelli v. Boragini*, 76 R.I. 60, 62, 68 A.2d 74 (1949); *Campanelli v. Vescera*, 75 R.I. 71, 74, 63 A.2d 722 (1949). In *Campanelli*, the Rhode Island Supreme Court specifically stated that "where one relies upon another's representation of an existing fact and is thereby misled to his dam-

age he may maintain an action for deceit, notwithstanding his failure to make further inquiry which was open to him at the time and which would have disclosed the falsity of such representation." 75 R.I. at 74. Thus, the mere negligence of a plaintiff is not a defense to an intentional misrepresentation. As one court aptly put it, "no rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool." *Chamberlin v. Fuller*, 59 Vt. 247, 256, 9 A. 832, 836 (1887).

 Rather than contributory negligence on the part of a plaintiff, the issue of justifiable reliance is more akin to assumption of the risk and "seems to turn upon an individual standard of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 108, at 751 (5th ed. 1984). Thus, the Rhode Island Supreme Court has stated that reliance is not justifiable when the falsity of a statement should be obvious to a plaintiff. *See Halpert*, 267 A.2d at 737 ("nothing patently absurd or ridiculous" in statement that house was free of termites; therefore, no duty to investigate). Although there is no caselaw on the subject in Rhode Island, most jurisdictions also impose a duty to investigate on complainants who, after becoming aware of inconsistencies between the facts and the defendant's representations, should have been put on notice that the representor's statements were false. *See, e.g., Trifiro v. New York Life Ins. Co.*, 845 F.2d 30, 33–34 (1st Cir.1988) ("explicit conflict engenders doubt, and to rely on a statement the veracity of which one should doubt is unreasonable"); *Kennedy v. Josephthal & Co., Inc.*, 814 F.2d 798, 805 (1st Cir.1987) (when plaintiffs "closed their eyes and passively accepted the contradictions" between oral misrepresentations and written representations, reliance was not justifiable as a matter of law).

 Here, there is "nothing absurd or patently ridiculous" about the representations regarding overcommercialization, compliance with the ABC Affiliate Agreement, and the Nielsen contract. *See Halpert*, 267

A.2d at 737. Furthermore, there is little reason why Anchor should have been on notice that these representations were false. The officers of Anchor, by their own admission, did not review the program logs of KOVR. Cross-defendants argue that since Anchor hired an accounting firm to review a random sampling of KOVR's logs, it had no right to rely upon any misrepresentations made by Cross-defendants. This might be true if the accountants' review put Anchor on notice of the discrepancies regarding compliance with the ABC Affiliate Agreement and commercialization. However, given the volume of information contained in the program logs and the fact that the accountants' responsibilities were to review the financial information, not to hunt for instances of non-compliance with the ABC Affiliate Agreement or overcommercialization, a reasonable jury could find that Anchor was not given reason to believe that Cross-defendants had misrepresented the facts.

Nor does it appear that Anchor executives watched enough television to put them on notice that the Cross-defendants' representations with regard to compliance with the ABC Affiliate Agreement and commercialization might be false. With respect to the covers of the ABC newsbrief, Anchor's witnesses testified that they generally do not watch prime time programming, during which the newsbrief is broadcast, because the network programs prime time, which therefore gives little indication of the quality of a station. There was no testimony to the contrary.

With respect to overcommercialization, Cross-defendants argue that when Alan Henry noticed "clutter" during the local news period, Anchor was put on notice that any representations concerning customary commercial practices may have been false. According to Cross-defendants, Anchor thereafter had a duty to investigate the truth of Cross-defendants' representations regarding commercialization. What Cross-defendants fail to recognize, however, is that Anchor did investigate further upon noticing the "clutter." Henry requested a "snapshot" of KOVR's commercial practices and received in response the allegedly false daypart sum-

mary. Although Anchor's witnesses had several different interpretations at trial as to what the numbers in the daypart summary actually reflected, the jury was entitled to believe Anchor's witnesses when they expressly stated that those numbers were false. Accordingly, there was sufficient evidence for a jury to find that Anchor justifiably relied on Cross-defendants' representations concerning compliance with the ABC Affiliate Agreement and commercialization.

■ Unfortunately for Anchor, however, a jury finding of justifiable reliance with respect to the Nielsen contract is not supportable. One of the misrepresentations on which the jury was instructed was Anchor's claim that Cross-defendants fraudulently misrepresented and concealed that KOVR had entered into a contract with Nielsen that lowered KOVR's 1988 expenses by decreasing payments in 1988 for services received by KOVR in 1988 and increased payments in 1989 and thereafter. Even if the jury found such a misrepresentation or found that Pfeiffer's representation in the Officer's Certificate regarding the accuracy of the disclosure letter was false, reliance would be unjustifiable as a matter of law. The last page of the Nielsen contract, which Anchor admitted it received, specifically shows that the base rate charges on the preceding page in Section III, which showed the original monthly base rate to be $10,000, was actually set at $3,000, the figure in the addendum that Anchor claimed was fraudulently concealed. Accordingly, Anchor had actual notice of at least an apparent discrepancy between the original base rate listed in Section III and the revised base rate on the next page. Moreover, an asterisk appears next to the original monthly base rate in Section III. Next to the asterisk, it says "see attached letter dated 4/7/88."

Faced with such explicit discrepancies, Anchor, a company with considerable experience in purchasing and operating television stations, had a duty to investigate further. *See, e.g., Trifiro*, 845 F.2d at 33–34. Yet Patrick Murphy, the Anchor executive who reviewed the Nielsen contract prior to purchasing KOVR, admitted that he made no effort to obtain the allegedly concealed addendum. "Justifiable reliance cannot be sat-

isfied by this reckless conduct." *Kennedy,* 814 F.2d at 805. Accordingly, Anchor's claim of fraudulent misrepresentation regarding the Nielsen contract should have never gone to the jury.[6] Because there is no way of determining whether the jury awarded Anchor damages on this improper count, Cross-defendants are entitled to a new trial on the issue of fraud. *See, e.g., Brochu,* 642 F.2d at 662 ("[o]rdinarily, to submit two counts for general verdict where the evidence does not justify recovery on both, constitutes error, since it cannot be told that the jurors did not take the wrong route.").

### 4. *Damages*

█ Although the Rhode Island Supreme Court has not approached the topic of damages for intentional misrepresentations in over eighty years, Rhode Island appears to follow the benefit-of-the-bargain rule. *See Barnes v. Whipple,* 68 A. 430 (R.I.1907). Under this rule, the measure of damages is the difference between the value of the property as represented and the actual value of the property. *Learjet Corp v. Spenlinhauer,* 901 F.2d 198, 203 (1st Cir.1990).

Cross-defendants make a two-pronged attack against Anchor's case for damages. First, Cross-defendants argue that Anchor's damage theory fails as a matter of law because Anchor offered no evidence of the actual value of KOVR. Second, Cross-defendants argue that Anchor's trial testimony about its "multiple" calculation was a sham and that no reasonable jury would believe this testimony concerning damages.

With respect to Cross-defendants' first argument that Anchor's damage theory fails as a matter of law, Cross-defendants contend that Anchor proved at trial only how it arrived at its bid for the station and what its bid would have been had Anchor eliminated from cash flow the revenue sources that it asserts were illegitimate. According to

Cross-defendants, this evidence does not constitute proof of actual value. Instead, Cross-defendants would have the Court require Anchor to adduce evidence of the value of KOVR, the sole asset of NTV, a Delaware corporation, under the "discounted cash flow" model[7] or "any techniques or methods which are generally considered acceptable in the financial community." *See Weinberger v. UOP, Inc.,* 457 A.2d 701, 713 (Del.Supr.1983).

█ Putting aside the fact that the Delaware cases to which Cross-defendants cite are directed to damages for breach of fiduciary duty and the fact that the fraud issues in this case are governed by Rhode Island law, it is clear that Anchor did present evidence of the value of KOVR through a technique generally considered acceptable for purchasing television stations. Every witness who testified on this matter at trial admitted that it is standard practice in the television industry to value television stations on the basis of cash flow times a multiplier. In fact, according to Lila Luna, Cross-defendant Pfeiffer asked her to prepare cash flow projections because the station would sell for a certain multiple times cash flow. Thus, when Anchor's witnesses testified to how Anchor determined KOVR's cash flow and why 13.6 was an appropriate multiplier, Anchor did present competent evidence of the actual value of KOVR.

Cross-defendants next argue that the testimony regarding Anchor's multiple calculation was a fabrication that no reasonable jury would believe. Cross-defendants point to various documents and deposition testimony in which Anchor officials swore to an entirely different multiple as well as entirely different bid formulations than testified to at trial. Specifically, Cross-defendants point to the "Partial Summary of Claim," prepared by Patrick Murphy on March 7, 1990, which indicated that the multiple to be used in the

6. For the same reason, Anchor's breach of representation claim regarding the Nielsen contract should not have gone to the jury.

7. As set forth in *Cede & Co. v. Technicolor, Inc.,* 1990 WL 161084 1990 Del.Ch.Lexis 171 (1990), the discounted cash flow model entails three basic components: "an estimation of net cash flows that the firm will generate and when, over some time period; a terminal or residual value equal to the future value, as of the end of the projection period, of the firm's cash flows beyond the projection period; and finally a cost of capital with which to discount to a present value both the projected net cash flows and the estimated terminal or residual value."

**44**

lawsuit would be 14.1, not 13.6. Moreover, a document prepared the day before Anchor submitted its initial bid indicates that the "acquisition price" was $148 million, not the $156 million that Anchor asserted at trial was its initial bid. Cross-defendants further point to David Bonderman's deposition testimony in which Bonderman testified that Anchor increased its bid by $8 million in three stages, not $6 million in two stages as Anchor executives testified at trial. Cross-defendants contend that these contradictions as well as various other inconsistencies allow but one conclusion—that Anchor's strategy was to "slam dunk" the auction process to ensure Anchor was the winning bidder in order to protect Robert Bass's investment in a savings bank in nearby Stockton.

Contrary to Cross-defendants' assertions, the inconsistencies that were brought out on cross-examination do not conclusively prove that Anchor's damage theory was a sham. Anchor's witnesses had sufficient explanations for these contradictions, and the jury obviously determined that these explanations were credible. For example, Patrick Murphy testified that he calculated the multiple of 14.1 merely because he was curious as to what the multiple would be based on the final bid of $162 million. Furthermore, several Anchor witnesses testified that the $148 million "acquisition price" reflected only a financing number and not a bid price. With respect to David Bonderman's deposition testimony which indicated a second stage in Anchor's bid formulation in which Anchor added $2 million to its bid, Bonderman explained to the jury that this $2 million reflected a possible earn-out bonus, which Anchor eventually rejected.

The jury had a full and fair opportunity to consider all of the documents and to view and assess both the direct and cross-examination. The jury rejected the defense and obviously determined that Anchor's witnesses were credible. There was clear evidence from Anchor's witnesses as to the use of the cash flow and multiplier and the precise calculations made. In these circumstances, the jury verdict should stand. *See Willco Kuwait (Trading) S.A.K. v. De Savary,* 638 F.Supp. 846, 851 (quoting *Rios v. Empresas Lineas*

*Maritimas Argentinas,* 575 F.2d 986, 990 (1st Cir.1978)) (" 'Where credibility of witnesses is an issue, special care must be taken not to invade the province peculiarly pertaining to the jury.' "), *aff'd in part, rev'd in part,* 843 F.2d 618 (1st Cir.1988).

## E. Agency, Alter Ego, and Conspiracy

NCI's liability for fraud can only be supported on the theories of agency, alter ego, or conspiracy because there is no evidence that the company or its agents made any representations to Anchor with respect to the issues involved in this case. Cross-defendants argue that the evidence is insufficient to support a jury verdict of fraud against NCI on any of the three theories.

In Rhode Island, "the three elements required to show the existence of an agency relationship include (1) a manifestation by the principal that the agent will act for him, (2) acceptance by the agent of the undertaking, and (3) an agreement between the parties that the principal will be in control of the undertaking." *Lawrence v. Anheuser–Busch, Inc.,* 523 A.2d 864, 867 (R.I.1987). The Rhode Island Supreme Court has emphasized that "[i]t is essential to the relationship that the principal have the right to control the work of the agent ... and that the agent act primarily for the benefit of the principal." *Id.* (citations omitted).

■ Although there was no explicit agreement that Pfeiffer and NTV were acting for NCI, the evidence is sufficient to sustain a finding that an agency relationship existed. Jonathan Nelson, who served as both a director of NCI and Executive Vice–President and Co–Chairman of the Board of Directors of NTV, testified that to the extent that Pfeiffer's interests were the same as NCI's with regard to providing information to Anchor, Pfeiffer was acting for NCI. There was also evidence that NCI, through Nelson, controlled the sale of KOVR, retained Goldman Sachs and selected the winning bid. There was further evidence that Nelson approved of and forwarded to Goldman Sachs a trade press article, which stated that NCI controlled a media empire including several television network affiliates such as KOVR. Moreover, Nelson drafted a press

release in October of 1988 that stated that NTV was a "unit" of NCI.

Anchor cites to other evidence of an agency relationship in the transcript which is unnecessary to detail at this time. Given the testimony outlined above, the jury could have reasonably found that NCI directed and controlled the sale of KOVR and that Pfeiffer and NTV acted as NCI's agents in facilitating the sale. Thus, the jury could have reasonably found NCI liable for the fraud of its agents, NTV and Pfeiffer. *See, e.g., Harold J. Warren, Inc. v. Federal Mut. Ins. Co.,* 386 F.2d 579, 582 (1st Cir.1967) ("an agent's attempt to defraud is attributable to his principal, if the agent is acting within the scope of his authority"); *Baker v. ICA Mortgage Corp.,* 588 A.2d 616, 617 (R.I.1991) (principal can be liable for criminal conduct of its agent).

■ There was insufficient evidence, however, for the jury to find that NCI was liable for the fraud of Pfeiffer or NTV on the basis of either alter ego or conspiracy theories. Under this Court's charge to the jury, before NCI could be held liable as the alter ego of NTV, Anchor was required to prove three things: 1) that NTV was created as a mere device or sham to accomplish some ulterior purpose; 2) that NTV was a mere instrumentality or agent of the individual or individuals who owned most of its stock; and 3) that NTV was used as an instrument to justify wrongdoing or protect fraudulent conduct. *See Oman International Finance, Ltd. v. Hoiyong Gems Corp.,* 616 F.Supp. 351, 363–66 (D.R.I.1985) (detailing requirements for disregarding corporate identity); *Vucci v. Meyers Brothers Parking Sys., Inc.,* 494 A.2d 530, 536 (R.I.1985). There was no evidence that NTV was created as a sham, or that the corporation was an instrumentality of the dominant stockholder, The Prudential Insurance Company of America. Nor was there any evidence that NTV and NCI did not observe their separate identities or that they co-mingled their assets. Accordingly, the alter ego theory cannot support a verdict against NCI.

■ Moreover, the evidence was insufficient to find that Jonathan Nelson of NCI conspired with Pfeiffer and NTV to fraudulently inflate the cash flow of KOVR. In order to establish a civil conspiracy, there must be evidence from which a party "may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise." *Thompson Trading, Ltd. v. Allied Breweries Overseas Trading, Ltd.,* 748 F.Supp. 936, 945 (D.R.I.1990) (quoting *Stubbs v. Taft,* 88 R.I. 462, 468, 149 A.2d 706, 708–09 (1959)). Furthermore, "[d]isconnected circumstances any one of which, or all of which, are just as consistent with a lawful purpose as with an unlawful undertaking are insufficient to establish a conspiracy." *Id.* Anchor does not point to any substantial evidence that Nelson or anyone else at NCI acted with a specific intent to do something the law forbids. Anchor's conspiracy claim, therefore, fails.

In sum, there is insufficient evidence to support a jury verdict of fraud against NCI on the basis of alter ego or conspiracy theories. Because there is no way to determine whether the jury relied on these improper theories of liability, NCI must be granted a new trial on the issue of fraud. *See Brochu,* 642 F.2d at 662; *see also Focus Investment Assocs., Inc. v. Am. Title Ins. Co., Et al.,* 992 F.2d 1231, 1243 (1st Cir.1993).

**F. Punitive Damages**

■ The jury awarded Anchor $1 million in punitive damages. In order to award punitive damages, there must be evidence that the acts or conduct of a defendant toward the plaintiff were so willful, reckless or wicked that they amounted to malice. *E.g., Greater Providence Deposit Corp. v. Jenison,* 485 A.2d 1242, 1244 (R.I.1984); *Morin v. Aetna Casualty & Surety Co.,* 478 A.2d 964, 967 (R.I.1984). There is simply no evidence in the record that Pfeiffer or Nelson acted with malice toward Anchor. Accordingly, Cross-defendants are entitled to a new trial on the issue of punitive damages unless Anchor accepts a remittitur of all such damages. *See Sarkisian v. Newpaper, Inc.,* 512 A.2d 831, 837 (R.I.1986) (trial judge can require plaintiff to choose either new trial on the issue of punitive damages or remittitur).

**46**

### G. Jury Inconsistencies

 Cross-defendants raise two potential jury inconsistencies as a basis for judgement n.o.v. or a new trial. First, Cross-defendants contend that there is no way to reconcile the fact that the jury awarded Anchor less than the entire escrow fund on Anchor's contract claims but also awarded Anchor damages for fraud. Second, Cross-defendants argue that by exonerating NFF and Narragansett Management Partners, the selling shareholders of NTV that actually gained from the sale of the station, and holding NCI, which gained nothing, liable for fraud, the jury verdict is irreconcilably inconsistent. Cross-defendants, however, have waived any argument as to alleged inconsistencies in the verdict by failing to raise the issue before the release of the jury. *Skillen v. Kimball*, 643 F.2d 19, 19–20 (1st Cir.1981).

Cross-defendants contend that because the verdict form here was a special verdict under Federal Rule of Civil Procedure 49(a) instead of a general verdict accompanied by answers to interrogatories under Rule 49(b), there is no waiver. *See, e.g., Pierce v. Southern Pacific Transp. Co.*, 823 F.2d 1366, 1369–70 (9th Cir.1987); *Malley–Duff & Associates, Inc. v. Crown Life Ins. Co.*, 734 F.2d 133, 144–45 (3d Cir.), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 564, 83 L.Ed.2d 505 (1984); *Mercer v. Long Mfg. N.C., Inc.*, 671 F.2d 946, 947–48 (5th Cir.1982). Rule 49(b) specifically provides that "[w]hen the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, judgment shall not be entered, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial." Because Rule 49(a) contains no similar provision, several circuits have held that special verdicts do not require objections before discharge of the jury. *See, e.g., Malley–Duff*, 734 F.2d at 144–45.

The First Circuit, however, applies a broader waiver rule that does not depend upon whether a verdict is a special verdict under Rule 49(a) or a general verdict with special interrogatories under Rule 49(b). In the First Circuit, if the "circumstances portend possible verdict inconsistency, the only efficient time to cure the problem is after the jury announces its results and before it is excused, and it is the responsibility of counsel to make a timely objection." *Austin v. Lincoln Equipment Associates, Inc.*, 888 F.2d 934, 939 (1st Cir.1989). One such circumstance that should alert the parties to potential inconsistency is the fact that the jury's verdict will be in the form of special answers. *Id.; McIsaac v. Didriksen Fishing Corp.*, 809 F.2d 129, 134 (1st Cir.1987). Cross-defendants, therefore, have waived any claim of verdict inconsistency by failing to object before the jury was excused.

 Even if Cross-defendants had not waived this issue, their argument as to jury inconsistency is of no avail because the jury verdict is not irreconcilably inconsistent. The First Circuit has exhibited " 'a substantial reluctance to consider inconsistency in civil jury verdicts a basis for new trials,' " and will uphold a special verdict "if there is a view of the case which makes the jury's answers consistent." *McIsaac*, 809 F.2d at 133 (quoting *Merchant v. Ruhle*, 740 F.2d 86, 91 (1st Cir.1984)). The jury here may very well have found that Cross-defendants breached only one representation in the Merger Agreement—the representation that KOVR was in compliance with the ABC Affiliate Agreement—and then reduced the damages for that breach from the requested $6,704,800 to $4,500,000 in order to take into account some of the Cross-defendants' concerns on cross-examination. Furthermore, it is entirely consistent to find that NCI, but not NFF or Narragansett Management Partners, was the principle of NTV, particularly when the record is devoid of any evidence that NFF or Narragansett Management Partners controlled the actions of NTV. Thus, even if the Court were to consider Cross-defendants' belated attempt to argue jury inconsistencies, the argument clearly fails.

### H. Pfeiffer's Breach of Contract Claim

 The jury returned a verdict against Pfeiffer on his claim that Anchor breached its Consulting Agreement with him. Pfeiffer has moved for judgment n.o.v. or a new trial because the verdict is against the clear weight of the evidence and the verdict was

prejudiced by the jury's allegedly incorrect findings on other issues. The Consulting Agreement required Pfeiffer to "devote reasonable efforts and such time as shall be necessary to provide requested advisory and consulting services ... provided, however, that Pfeiffer shall in no event be required to devote in excess of ten (10) hours per month in rendering such services ..." Pfeiffer introduced no evidence that he performed any acts required by him under the contract. The only evidence concerning Pfeiffer's conduct with respect to the Consulting Agreement was provided by Larry Clamage, who testified that when he tried to consult with Pfeiffer, Pfeiffer didn't return phone calls. On the basis of this evidence, the jury was entitled to find that Pfeiffer had not sustained his burden of proof that he substantially performed the contract.

Pfeiffer also argues that he is entitled to a new trial on his breach of contract claim because the jury's allegedly incorrect findings on other issues prejudiced their finding on Pfeiffer's breach of contract claim. To support this proposition, Pfeiffer relies on a series of cases holding that a partial new trial is improper unless it clearly appears that the issues to be retried are distinct and separable from other issues. *See, e.g., Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931); *Payton v. Abbott Labs,* 780 F.2d 147, 154 (1st Cir.1985). In the present case, Pfeiffer's breach of contract claim is entirely distinct from Anchor's claims of breach of the Merger Agreement and fraud. The claims involve separate contracts and separate conduct. Thus, a partial new trial on several of Anchor's claims will not result in confusion and uncertainty, and Pfeiffer's motion for a new trial with respect to this issue is denied.

## CONCLUSION

In sum, Cross-defendants are entitled to a new trial on Anchor's claims of breach of representation, warranty, and covenant. Cross-defendants Edwin Pfeiffer and NCI are entitled to a new trial on Anchor's claim of fraud. Cross-defendants Pfeiffer and NCI are also entitled to a new trial on the issue of punitive damages unless Anchor agrees to a remittitur of all such damages. All other motions for judgment n.o.v. or a new trial are denied.