**FLEET NATIONAL BANK, Plaintiff,**

v.

**ANCHOR MEDIA TELEVISION, INC., and Kovr of Delaware, Inc., Defendants, Appellants.**

**Narragansett Capital, Inc., and Edwin Pfeiffer, Defendants, Appellees.**

No. 94–1490.

United States Court of Appeals, First Circuit.

Heard Nov. 9, 1994.

Decided Jan. 26, 1995.

---

Stephen M. Sacks, with whom Tim Atkeson, Arnold & Porter, Washington, DC, Anthony F. Muri, and Goldenberg & Muri, Providence, RI, were on brief, for appellants.

Charles I. Poret, with whom Richard M. Sharfman, Mark J. Kenney, A. Lauriston Parks, Sharfman, Shanman, Poret & Siviglia, P.C., New York City, Severson & Werson, San Francisco, CA, and Hanson, Curran, Parks & Whitman, Providence, RI, were on brief, for defendants-appellees Narragansett Capital, Inc. and Edwin Pfeiffer.

Before CYR, Circuit Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

BOWNES, Senior Circuit Judge.

In this appeal, appellants Anchor Media Television, Inc. ("Anchor"), and KOVR–TV of Delaware, Inc. ("KOVR"), contend that the district court committed several legal and discretionary errors in the course of two trials of their claims of fraud and breach of contract against appellees Narragansett Capital, Inc. ("Narragansett"), KOVR's former owner, and Edwin Pfeiffer, KOVR's former general manager. After carefully reviewing the record and considering appellants' arguments, we affirm.

# I.

## BACKGROUND

The complicated factual predicate of this litigation has been meticulously rehearsed in a published opinion by the district court. *See Fleet Nat'l Bank v. Anchor Media Television, Inc.*, 831 F.Supp. 16, 21–31 (D.R.I. 1993). It will be reiterated here only to the extent necessary to resolve the issues before us.

The case arises out of Narragansett's sale to Anchor of KOVR, an ABC-affiliate television station located in Sacramento, California. Anchor was awarded the station after submitting the high bid at a closed auction held in late September 1988. The sale price eventually agreed upon by the parties was $162 million. The deal was structured as a merger of an Anchor subsidiary into the corporate owner of KOVR, and became final on January 25, 1989. The terms of the merger were memorialized in a merger agreement ("the Agreement") dated October 12, 1988. The case came before the district court as an interpleader action filed by plaintiff Fleet National Bank ("Fleet"). Fleet controlled a $5 million escrow account established by the Agreement to address claims that might arise from KOVR's sale. In its complaint, Fleet asked the district court to determine proper allocation of the escrow funds. Anchor and Narragansett, among others, were named as defendants to the action.

Subsequently, Anchor filed cross-claims against Narragansett and Pfeiffer, alleging breach of the Agreement and common law fraud.[1] Underlying these claims were allegations that Narragansett had fraudulently increased its cash flow in the months preceding the auction by: (1) actually running more commercials than was customary in the industry while representing that it was running fewer commercials than was customary ("the overcommercialization allegation"); (2) running local commercials at a time when it was contractually obliged to be running an ABC newsbrief ("the ABC newsbrief allegation"); (3) surreptitiously shifting to subsequent years certain operating expenses incurred as a result of a contract with Nielson Media Research[2] ("the Nielson allegation"); and (4) charging political candidates too much money to run political advertisements ("the political advertising allegation"). We discuss the particulars of these allegations *infra*.

Anchor claimed that these practices had a damaging effect upon its bid, which was largely formulated in accordance with standard industry valuation practices—i.e., by taking the projected year-of-sale cash flow (essentially, profit) and multiplying it by a number ("the multiplier") which appropriately accounted for certain characteristics inhering in the target market. In projecting year-of-sale cash flow, Anchor used actual cash flow figures from January 1, 1988 through August 31, 1988, and financial information which enabled it to project cash flow from September 1, 1988 through the end of the year. All of the information on which Anchor relied in formulating its bid was generated prior to September 28, 1988, the day on which the bid was submitted.

█ Put in concrete terms, Anchor argued that Narragansett's fraudulent inflation of its 1988 cash flow (quantified at trial as being at least $1,943,000) caused Anchor to bid at least $27 million more for the station than it would have absent the fraud. Anchor reached this number by taking the amount of improperly-obtained 1988 cash flow and multiplying it by 13.6, the multiplier it had used in valuing the Sacramento market. This "effect on the bid" constituted Anchor's theory of damages.[3]

---

1. Pfeiffer also brought a cross-claim against Anchor for breach of his employment contract. The subject matter of this claim is not before us.

2. Nielson Media Research is a rating service that monitors audience viewership of a television station. *Fleet Nat'l Bank*, 831 F.Supp. at 28.

3. We have some doubts about the viability of Anchor's "effect on the bid" damages theory in the context of this case. The parties agree that Rhode Island law, which governs Anchor's fraud claim, applies the "benefit of the bargain" rule in assessing damages for fraudulent misrepresentations inducing a party to contract for the purchase of property. *See Barnes v. Whipple*, 68 A. 430 (R.I.1907). Under this rule, the defrauded purchaser is entitled to recover the difference between the actual value of the purchased item and its value had the seller's representations

## A. The First Trial

A jury trial commenced on April 2, 1991, and lasted fourteen trial days. In the course of the trial, the district court ruled, as a matter of law and for a variety of reasons, that a reasonable jury could not find a breach of the Agreement or fraud on the basis of the political advertising allegation. The court did, however, allow Anchor to present to the jury, as the predicate for its contract and fraud claims, the evidence underlying its overcommercialization, ABC newsbrief, and Nielson allegations.[4] At the trial's conclusion, the jury awarded Anchor $4.5 million for breach of contract and $13.5 million for fraud. It also awarded Anchor $1 million in punitive damages.

Subsequent to this verdict, and in accordance with then-Fed.R.Civ.P. 50(b), Narragansett and Pfeiffer moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. For reasons not disclosed by the record, the district court kept this motion under advisement for more than two years, until June 1993, when it issued *Fleet Nat'l Bank. See* 831 F.Supp. 16.

In addressing the Rule 50(b) motion, the court first held that Narragansett and Pfeiffer were entitled to a new trial on Anchor's breach of contract claim. *See id.* at 34–38.

While the court believed that there had been sufficient evidence to support the jury's contract verdict based on the ABC newsbrief allegation, *id.* at 34–36, it determined that the evidence did not permit a reasonable jury to find breach of contract on the basis of either the overcommercialization or Nielson allegations, *id.* at 36–37 and 43 n. 6. In making this determination, the court ruled that Narragansett and Pfeiffer had not made any representations or warranties *in the Agreement* regarding the number of commercials KOVR had broadcast in 1988, *id.* at 36–37, and that the Nielson allegation was not viable because Anchor had failed to prove justifiable reliance on the alleged misrepresentation, *id.* at 43 n. 6. A new trial was ordered because the general verdict form did not allow the court to ascertain whether the jury had relied on the legally defective allegations in reaching its contract verdict. *Id.* at 37–38 (citing, *inter alia, Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.,* 370 U.S. 19, 29–30, 82 S.Ct. 1130, 1135–36, 8 L.Ed.2d 305 (1962) and *Brochu v. Ortho Pharmaceutical Corp.,* 642 F.2d 652, 662 (1st Cir.1981)).

The court also held that Narragansett was entitled to a new trial on Anchor's fraud claim. *See id.* at 38–44. While the court believed that there had been sufficient evi-

---

been true. *See Learjet Corp. v. Spenlinhauer,* 901 F.2d 198, 203 (1st Cir.1990) (applying Kansas law); *see also* J.F. Rydstrom, Annotation, *"Out of Pocket" or "Benefit of Bargain" as Proper Rule of Damages for Fraudulent Representations Inducing Contract for the Transfer of Property,* 13 A.L.R.3d 875, 885 (1967). This value differential is measured at the time of the sale. *Learjet Corp.,* 901 F.2d at 203.

When (as is usually the case) the negotiation of the sale price immediately precedes the consummation of the sale, the effect of the seller's fraud on the purchase price will almost invariably quantify the difference between the actual value of the purchased item and its value had the representations been true. Here, however, the consummation of the sale (i.e., the merger) took place nearly four months *after* the negotiation of the sale price, at a time when fluid market conditions (there was much testimony to this effect) might have led a buyer to utilize a *different* multiplier than the one Anchor used in formulating its bid. Moreover, the merger took place in a calendar year *different* from the one in which the sale price was negotiated. A buyer applying Anchor's valuation theory *at the time of merger*

therefore would presumably have been looking at a different period of time in projecting cash flow than the one at which Anchor looked. Thus, it strikes us as somewhat speculative to infer that the effect Narragansett's fraud had on Anchor's 1988 bid accurately quantifies the difference between the actual value of KOVR on January 25, 1989 (the date of the merger) and its putative value on that date had Narragansett's representations been true.

In any event, Narragansett has not raised the absence of proof of damages as an alternative ground for affirmance. Because this issue is somewhat involved and has not been argued, and because we believe that affirmance is otherwise compelled on the record and briefs before us, we do not delve further into the damages question at this time.

4. In so stating, we reject Anchor's contention on appeal that the Nielson allegation did not constitute part of its breach of contract claim. In fact, we find this argument difficult to fathom. In his closing argument, Anchor's trial counsel clearly asserted that the alleged subterfuge involving the Nielson contract constituted a breach of the Agreement.

dence to support the jury's verdict on this claim with regard to the ABC newsbrief and overcommercialization allegations, it ruled that the defective Nielson allegation may have poisoned the general fraud verdict beyond cure. *Id.* at 42–43.

Finally, the court negated the jury's punitive damages award as lacking evidentiary support. *Id.* at 45. Anchor does not challenge this ruling on appeal.

## B. The Second Trial

In accordance with the district court's opinion, a second jury trial commenced on March 21, 1994, and lasted eleven trial days. Prior to submitting the case to the jury, the court ruled as a matter of law, *see* Fed. R.Civ.P. 50(a), that Anchor's overcommercialization allegation could not be presented to the jury in support of its fraud claim, and that Anchor's ABC newsbrief allegation could not be presented to the jury in support of its contract claim. The court based these rulings on determinations that Anchor had not proven damages in connection with its overcommercialization allegation, and that Anchor had not provided Narragansett and Pfeiffer with notice of the ABC newsbrief allegation within the fifteen-day time period contemplated by the Agreement.[5] The court also rebuffed Anchor's attempt to revive its political advertising allegation at this time. Thus, only Anchor's fraud claim, now based solely on the ABC newsbrief allegation, went to the jury. The jury returned a verdict in favor of Narragansett and Pfeiffer on this claim. After the verdict, the court took the apparently unprecedented step of granting the verdict's beneficiaries judgment as a matter of law on the same claim. In so doing, the court stated that it was ruling on the reserved motion so that any error in the jury instructions could be ignored in subsequent proceedings. This appeal followed.

## II.

## STANDARD OF REVIEW

■ We first deal with a technical, nomenclature matter. Rule 50 was amended during the course of the proceedings before the district court. The amendments abandoned the terms "directed verdict" and "judgment n.o.v.," which were commonly associated with the former Rule, in favor of the phrase "judgment as a matter of law." *See generally* Fed.R.Civ.P. 50 advisory committee's note. The amendments did not, however, affect either the standard by which district courts review motions brought under the Rule or the standard by which we review a district court's rulings. *See id.* ("If a motion is denominated a motion for directed verdict or for judgment notwithstanding the verdict, the party's error is merely formal. Such a motion should be treated as a motion for judgment as a matter of law in accordance with this rule."). For simplicity's sake, we therefore refer to Narragansett's and Pfeiffer's various motions, however denominated at the time of filing, as motions for judgment as a matter of law.

■ To the extent that Anchor is challenging the district court's post-trial rulings that Narragansett and Pfeiffer were entitled to judgment as a matter of law on certain issues, our review is *de novo*. *See Lama v. Borras,* 16 F.3d 473, 477 (1st Cir.1994) (affirming denial of a post-verdict Fed.R.Civ.P. 50(b) motion for judgment as a matter of law); *Rolon–Alvarado v. Municipality of San Juan,* 1 F.3d 74, 77 (1st Cir.1993) (affirming grant of Fed.R.Civ.P. 50(a) motion for judgment as a matter of law at the close of plaintiff's case). Thus, we will affirm these rulings only if, after scrutinizing the proof and inferences derivable therefrom in the light most hospitable to Anchor, we determine that a reasonable factfinder could have reached but one conclusion: that Narragansett and Pfeiffer were entitled to judgment. *See Lama,* 16 F.3d at 477. Because the court's order granting Narragansett and Pfeiffer a new trial was based *solely* upon its legal conclusions that defective claims had been allowed to go to the jury, we first determine the correctness of the court's rulings in this regard.

---

**5.** Section 8.5 of the Agreement required any party with a claim arising out of the Agreement to send a notice of claim to the breaching party within fifteen business days of coming to the belief that it had suffered damages in connection with the claim.

■ If we decide that the court's legal conclusions were correct, our review becomes significantly more circumscribed. Where the trial court has correctly determined that legal error infected a claim presented to the jury, we will defer to the court's judgment that a new trial was called for on that claim absent an abuse of discretion. *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 190, 66 L.Ed.2d 193 (1980) (*per curiam* ); *see also Payton v. Abbott Labs.* 780 F.2d 147, 152 (1st Cir.1985); 11 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 2818, at 119–20 (1973) (deference is appropriate because "[t]he trial judge was on the spot and is better able than an appellate court to decide whether the error affected the substantial rights of the parties").

■ Deference in this case is particularly appropriate for two reasons. First, in its published opinion, the district court explicitly cited as controlling authority two cases which make clear that courts should set aside jury verdicts in only the most compelling of circumstances. *See Fleet Nat'l Bank*, 831 F.Supp. at 32 (citing *Coffran v. Hitchcock Clinic, Inc.*, 683 F.2d 5, 6 (1st Cir.) (trial judge may not set aside jury verdict merely because s/he would have reached a different conclusion than the jury), *cert. denied*, 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982), and *Borras v. Sea–Land Serv., Inc.*, 586 F.2d 881, 886 (1st Cir.1978) (trial court may set aside jury verdict only where verdict (1) is against clear weight of evidence; (2) is based upon evidence which is false; or (3) will result in a miscarriage of justice)). And second, in that same opinion, the court clearly stated its reasons for ordering a new trial. *See id.* at 37–38 and 43 (court could not tell whether jury had awarded Anchor damages on erroneously submitted evidence or improperly allowed arguments).

■ Finally, we review the district court's rulings excluding evidence offered by Anchor under the abuse of discretion standard. *E.g., Fairfield 274–278 Clarendon Trust v. Dwek*, 970 F.2d 990, 995 (1st Cir.1992). Moreover, we are free to affirm the trial judge's deci-

sions "on any independently sufficient ground made manifest by the record." *See, e.g., Ticketmaster–New York, Inc. v. Alioto*, 26 F.3d 201, 204 (1st Cir.1994).

With these criteria in mind, we review Anchor's claims.

### III.

### DISCUSSION

Anchor makes a number of arguments, the order of which we rearrange for ease of analysis. As to the first trial, Anchor contends:. (1) the court erred in deciding that the evidence was insufficient for a reasonable jury to have found fraud based on the Nielson allegation; (2) the jury could not, at any rate, have relied upon this allegation in reaching its contract and fraud verdicts;[6] and (3) the court erred in ruling post-trial that Anchor should not have been allowed to raise the issue of overcommercialization in connection with its breach of contract claim.

As to the second trial, Anchor asserts: (1) the district court improperly prohibited its witnesses from testifying regarding customary levels of commercialization in the industry; (2) the court otherwise erred in taking from the jury the fraud claim based on the overcommercialization allegation; (3) the court erroneously precluded Anchor from renewing its claims based on the political advertising allegation; (4) the court improperly excluded certain "state of mind" evidence relevant to the question of when Anchor learned that it had suffered damages as a result of the improper running of local commercials during the ABC newsbrief time slot; (5) the court otherwise erred in taking from the jury the breach of contract claim based on the ABC newsbrief allegation; (6) the court erred in instructing the jury on the one issue—fraud based on the ABC newsbrief allegation—the jury was permitted to consider; and (7) the court was without the power to grant judgment as a matter of law to Narragansett and Pfeiffer after the jury had returned a verdict in their favor on this issue.

---

6. We have already rejected Anchor's argument that the district court erred in assuming that the

Nielson allegation partially undergirded the breach of contract claim. *See supra* note 4.

## A. Alleged First Trial Errors

### 1. Legal Viability of the Nielson Allegation

Anchor first argues that the court erred in determining that the evidence was insufficient for a reasonable jury to have found fraud based on the Nielson allegation. As previously stated, the Nielson allegation involved the claimed surreptitious shifting to subsequent years of certain 1988 operating expenses incurred as a result of a contract between Narragansett and Nielson Media Research. The specifics of the allegation are as follows.

Sometime after August 3, 1988, at the time Anchor was preparing to submit its bid, Narragansett supplied Anchor with a box that contained hundreds of contracts involving KOVR. One of these was the Nielson contract, which set the monthly amount that KOVR would pay for Nielson's rating service. Attached to the contract was a two-page appendix. On the first page of the appendix, in a section captioned "Base Rate per Month," the figure "$10,000" was typed in the space provided for the time period May 1988 through April 1989. An asterisk was next to this figure, and a corresponding note, typed at the bottom of the same page, read "see attached letter dated 4/7/88." No letter was attached to the contract.

The second page of the appendix included a computation worksheet. The worksheet included a space for "Base Rate per Month." The figure "$3,000" was typed in this space. Further down the page was a space captioned "Monthly Adjustment (estimated) as of May 1988." The figure "$90.00," which represented 3% of the base monthly rate, was typed in this space. Directly beneath this was a space captioned "Estimated Monthly Net Charge as of May 1988." The figure "$3,090.00," which represented the Base Rate per Month plus the Monthly Adjustment, was typed in this space.

The discrepancy between the base monthly rates provided for on the first and second pages of the appendix was explained in the 4/7/88 letter, which Anchor discovered only after taking control of KOVR. This letter memorialized Nielson's agreement to Narragansett's request to defer until the following year $7,000 per month in payments owed for the period May through December 1988. Anchor alleged that Narragansett's failure to include the 4/7/88 letter in the box of contracts involving KOVR amounted to a fraudulent concealment of the deferral of 1988 operating expenses in an attempt to inflate 1988 cash flow. The alleged misrepresentations were the "$10,000" base monthly rate figure typed on the first page of the Nielson contract appendix, and subsequent representations by Narragansett officials (including Pfeiffer), both oral and in the Agreement, that Narragansett had provided Anchor with a true and complete set of contracts relating to KOVR.

In its order on the motions filed subsequent to the first trial, the district court stated that, in order to make out a fraud claim under Rhode Island law (which governs here), Anchor was required to prove that Narragansett and Pfeiffer knowingly misrepresented a material fact with intent to deceive, thereby inducing Anchor to rely justifiably on the misrepresentation to its detriment. See Fleet Nat'l Bank, 831 F.Supp. at 38. The court then concluded that, in light of the asterisk referring interested readers to the 4/7/88 letter and the two statements on the second page of the Nielson contract appendix referencing a $3,000 base monthly rate for May 1988, no reasonable jury could have found that Anchor justifiably relied on the $10,000 representation on the first page of the Nielson contract's appendix. See Fleet Nat'l Bank, 831 F.Supp. at 42–43.

 Regardless of whether Anchor's reliance was justifiable, we regard as independently supported the district court's conclusion that the fraud claim based on the Nielson allegation was not legally viable. See Alioto, 26 F.3d at 204. Under Rhode Island law, liability for fraud cannot attach unless the misrepresentation at issue was intentionally made with an intent to deceive. See East Providence Loan Co. v. Ernest, 103 R.I. 259, 236 A.2d 639, 641 (1968); see also Cliftex Clothing Co., Inc. v. Di Santo, 88 R.I. 338, 148 A.2d 273, 275 (1959); Campanelli v. Vescera, 75 R.I. 71, 63 A.2d 722, 723 (1949); Cheetham v. Ferreira, 73 R.I. 425, 56 A.2d

861, 864 (1948). In our view, the same representations and references (i.e., the asterisk, reference to the 4/7/88 letter, and correct statements of the base monthly rate) which led the district court to determine that Anchor's reliance on the $10,000 figure was not justifiable compel the conclusion that the alleged misrepresentations were not intentionally made with an intent to deceive. Simply put, we do not think a jury could reasonably infer such an intent where there is an explicit reference to the term-altering document—the 4/7/88 letter—*on the same page* as the crucial alleged misrepresentation, where the true base monthly rate is *twice* set forth on the *very next page* of the addendum, and where there is no evidence that the exclusion of the letter from the box of documents involving KOVR was intentional. Accordingly, we affirm the court's grant of judgment as a matter of law to Narragansett and Pfeiffer on Anchor's fraud claim based on the Nielson allegation.

### 2. Effect of the Nielson Allegation on the Verdict

Anchor makes an alternative argument that the Nielson allegation, and its supporting evidence, could not possibly have influenced the jury's verdict on its breach of contract and fraud claims. Anchor contends that it introduced little evidence in support of the Nielson allegation at trial, and that it did not quantify the damages arising out of it during its closing. Relying on this contention, Anchor asserts that the district court, by jettisoning the contract and fraud verdicts, allowed "the tail to wag the dog."

Although the Nielson allegation was not the primary focus of Anchor's case, a review of the first trial record shows that Anchor specifically mentioned it in both its opening and closing arguments. Moreover, Anchor supported the allegation by having Patrick Murphy, its Chief Financial Officer, testify to the incompleteness of the Nielson contract and explain to the jury that the omission of the 4/7/88 letter from the box of contracts involving KOVR fraudulently "presented to us a larger cash flow than what they should have because of the shifting of expenses." And while Anchor did not quantify for the

jury the damages arising out of the Nielson allegation, it did provide the jury with a damages theory (i.e., improperly-obtained 1988 cash flow multiplied by 13.6, the multiplier Anchor used in arriving at its bid) by which the jury could easily and rationally have quantified the damages for itself. In light of all this, and in the absence of any suggestion on appeal that a remittitur would have been appropriate, we cannot say that the district court abused its discretion in determining that the general fraud and contract verdicts returned at the conclusion of the first trial may have been incurably infected by the legally deficient Nielson allegation. Accordingly, we affirm the district court's decision to award Narragansett and Pfeiffer new trials on Anchor's contract and fraud claims.

### 3. The Breach of Contract Claim Based on the Overcommercialization Allegation

As we have noted, a second basis for the setting aside of the contract verdict was the district court's post-trial determination that there were no representations or warranties in the Agreement regarding the number of commercials KOVR had been running prior to Anchor's submission of its bid. Anchor claims that the court erred in reaching this conclusion, denoting three contractual provisions which, in its view, a reasonable juror could have construed as pertaining to 1988 commercialization levels.

The first of these provisions, which can be found at paragraph 5.1(a) of the Agreement, and which is captioned "Conduct of the Business Until Effective Time," states: "Except as [Anchor] may otherwise consent in writing, until the Effective Time [Narragansett] *will* (i) operate its business only in the usual, regular and ordinary manner...." (Emphasis supplied). Plainly, through its use of the future tense "will," this representation covers only the period of time between the date of the Agreement, October 12, 1988, and the date the merger became effective, January 25, 1989. Thus, despite Anchor's

attempts to convince us otherwise,[7] paragraph 5.1(a) simply cannot be read as pertaining to the period of time (i.e., that portion of 1988 *prior to* Anchor's submission of its bid) when the sale and running of too many commercials at KOVR might have affected the amount Anchor bid for the station. And because Anchor's damages theory involved only the effect of artificially inflated 1988 cash flow *on its bid,* conduct which took place after the submission of the bid is completely irrelevant to its claims.

The second provision, found at paragraph 5.1(e) and captioned "Preservation of Business," does not help Anchor for the same reason. The provision states: "[Narragansett] *shall* conduct the business and operations of the Station diligently and in the ordinary course in substantially the same manner as heretofore conducted." (Emphasis supplied). Through its use of the future tense "shall," this provision also only covers a period of time subsequent to October 12, 1988, the date of the Agreement. And as we have explained, any improper actions taken by Narragansett or Pfeiffer during this time period are irrelevant under the damages theory pursued by Anchor.

The final provision relied upon by Anchor, paragraph 4 .1(f), simply cannot be construed as warranting "customary" commercialization levels at KOVR. Captioned "Absence of Certain Changes or Events," the provision sets forth a number of illustrative asset-dissipating and capital structure-altering events and transactions, warranting an absence of such events or transactions "since the date of the Unaudited Financial Statements [August 31, 1988]." The proviso upon which Anchor seizes states that "the Company has not ... (v) entered into ... any other material commitment, contractual obligation or transaction other than in the ordinary course of business...."

Leaving aside the fact that Anchor did not introduce specific evidence of overcommercialization at KOVR from August 31, 1988 through September 28, 1988 (the only period

of time prior to Anchor's submission of its bid that this provision can be read to cover), we are at a loss to see how it would be reasonable to regard the sales of commercials challenged here as being transactions outside of KOVR's "ordinary course of business." As the district court observed, paragraph 4.1(f)'s "ordinary course of business" proviso, when read in context, should be construed as simply warranting that Narragansett had not entered into any transactions (1) of an unusual type for a television station; or (2) that would tend to unduly dissipate KOVR's assets or alter its capital structure. *See Fleet Nat'l Bank,* 831 F.Supp. at 37. Certainly, sales of commercial time are not unusual transactions for a television station; indeed, the revenues generated by such sales constitute a station's lifeblood. Moreover, the record is devoid of evidence that the number of such sales entered into by Narragansett during the relevant time period—even if in excess of industry norms—threatened to unduly dissipate KOVR's assets or alter its capital structure.

To be sure, the actual meaning of a contractual provision which can *reasonably* accommodate two or more interpretations should be left to the jury. *See, e.g., Bushkin Assocs., Inc. v. Raytheon Co.,* 815 F.2d 142, 148–49 (1st Cir.1987) (applying Massachusetts law). But the question whether a provision can reasonably support a proffered interpretation is a legal one, to be decided by the court. *See Fashion House, Inc. v. K Mart Corp.,* 892 F.2d 1076, 1083 (1st Cir. 1989) (applying Michigan law) ("Determining whether or not a contract is ambiguous is, like other questions of contract construction, a matter for the court."). Here, we think that the court correctly determined that Anchor's proffered interpretation of paragraph 4.1(f)'s "ordinary course of business" proviso—which reads the proviso as warranting customary commercialization levels at KOVR during 1988—was not one that a reasonable juror could accept. Accordingly, we affirm the court's ruling.

---

7. In what appears to be an attempt to avoid paragraph 5.1(a)'s temporal limitations, the citation to paragraph 5.1(a) in Anchor's brief omits paragraph 5.1(a)'s caption ("Conduct of Business

Until Effective Time") and alters the phrase "will (i) operate" to read "operat[ed]." If this was deliberate, it was deceptive; if a mistake, it was inexcusable.

In sum, we agree with the district court that Anchor should not have been permitted to present the Nielson allegation to the jury, and that Anchor should not have been allowed to raise the issue of overcommercialization in connection with its breach of contract claim. We further rule that the court did not abuse its discretion in determining that these improperly asserted allegations may well have affected the jury's general contract and fraud verdicts at the first trial. We therefore affirm the court's post-trial order, *see Fleet Nat'l Bank*, 831 F.Supp. 16, in all respects.[8]

## B. Alleged Second Trial Errors

### 1. Exclusion of Witness Testimony Regarding Customary Levels of Commercialization in the Industry

Anchor complains that, at the second trial, the district court improperly excluded, for lack of foundation, testimony by Anchor's Senior Vice President, Lawrence Clamage, regarding customary levels of commercialization in the industry. Anchor underscores this point by pointing out that Clamage was permitted to testify, over objection, to industry norms in the first trial, and that the court offered no rationale for its contrary ruling at the second trial. Anchor further contends that the court committed legal error in not allowing it to read to the jury testimony regarding industry norms given at the first trial by John Sheehan, who was unavailable for the second trial. In the alternative, Anchor asserts that the court abused its discretion by denying it a one-day continuance so that Sheehan could appear. Anchor claims that all three of these erroneous, discretionary rulings were highly prejudicial because the court's award of judgment as a matter of law on Anchor's fraud claim based on overcommercialization was premised upon an absence of evidence by which Anchor could "structure the amount of damages for overcommercialization."

While the equities of the situation involving Sheehan are not nearly as one-sided as Anchor represents them in its brief,[9] we can understand Anchor's frustration with the court's failure to explain why Clamage's testimony was admissible in the first trial but not in the second. Especially in light of the two-year delay in deciding the new trial motion, we think that Anchor was entitled to an explanation for the court's change of mind. The fact of the matter is, however, that evidence regarding commercialization norms in the industry was completely irrelevant in the second trial.

■■■ As we have explained, the court properly ruled that the Agreement could not be construed as warranting customary commercialization levels during the time period Anchor examined in developing its bid. And the only other evidence of a representation regarding commercialization levels at KOVR introduced by Anchor at the second trial was the so-called July/August 1988 day-part summary, a document that summarized commercialization levels and commercial-generated income by day and time (e.g., 7/25, 8:00–9:00 p.m.) for July and August 1988. The July/August 1988 day-part summary allegedly misrepresented that KOVR was *undercommercialized* in July and August 1988 and understated commercial-generated income during this same period. Thus, there was no evidence in the second trial of a representation to Anchor that KOVR was commercialized in accordance with industry norms in 1988, and Anchor had no basis for arguing that it was damaged because it bid too much in reliance on such a representation. Accordingly, we affirm the court's exclusion of the testimony regarding industry standards on the independent ground that it was irrele-

---

8. Because of these rulings, we need not discuss whether the court's new trial order on the fraud claim against Narragansett can be alternatively upheld on the basis of the court's post-trial determination that it should not have submitted to the jury the question of Narragansett's vicarious liability as Pfeiffer's alter ego or co-conspirator. *See Fleet Nat'l Bank*, 831 F.Supp. at 44–45.

9. Anchor had more than a month's notice that the second trial would begin on March 21, 1994. Despite this notice, Anchor apparently did not ascertain Sheehan's availability as a witness until it was in the middle of presenting its case. Indeed, Anchor did not communicate with Sheehan at all between January 27, 1994 and March 25, 1994, the date on which it learned of Sheehan's unavailability.

vant. *See Alioto,* 26 F.3d at 204; *see also* Fed.R.Evid. 402 ("Evidence which is not relevant is not admissible.").[10]

### 2. The Fraud Claim Based on the Overcommercialization Allegation

As noted, subsequent to the conclusion of Anchor's case in the second trial, the district court granted Narragansett and Pfeiffer judgment as a matter of law on Anchor's fraud claim based on the overcommercialization allegation for failure to prove damages. Anchor contests this ruling, arguing that it proved expectancy damages by demonstrating the difference between the actual revenue generated by the "too many" commercials run in 1988, and the lower revenue the July/August 1988 day-part summary falsely indicated was being generated. *See supra* note 10.

■■■ Throughout both trials, Anchor consistently maintained that KOVR was covertly running commercials far in excess of industry norms during the time period Anchor examined in formulating its bid. Anchor also consistently contended that, after taking over the station in 1989, it had to reduce commercialization levels in order to bring the station into conformity with industry norms. Given these positions, Anchor would have been estopped from raising, near the conclusion of its case in the second trial, an explicit alternative argument that it expected to commercialize at levels *commensurate with* those actually employed at KOVR in 1988. *Cf. Desjardins v. Van Buren Community Hosp.,* 37 F.3d 21, 23 (1st Cir.1994) (doctrine of judicial estoppel "may apply to bar a litigant from engaging in intentional self-contradiction as a means of obtaining unfair advantage") (citations omitted). Such an argument was, however, implicit in Anchor's alternative damages theory.

In quantifying its expectancy damages by subtracting the lower, misrepresented revenues set forth in the July/August day-part summary from the higher, actual 1988 revenues that KOVR was generating, and in explicitly repudiating any suggestion that the lower, misrepresented revenues more properly should be subtracted from the revenues the station would have generated had it been commercialized in accordance with industry norms, Anchor implicitly argued that, at the time it bought the station, it expected to generate the same commercial revenues it *later* learned that the station had generated in 1988. Absent a proffer that it somehow anticipated earning these revenues by commercializing in accordance with industry norms, however, (and there was no such proffer here), the only way Anchor could have expected to earn the higher revenues was if it expected to run the same number of commercials that Narragansett actually had been running in July/August 1988. In other words, given the state of the record at the

---

**10.** After the district court excluded evidence regarding industry norms at the second trial, Anchor argued an alternative "expectancy" damages theory. Under this late-arising theory, Anchor sought to recover the revenue it expected to generate by running more commercials on KOVR, which it had been fraudulently induced to believe was substantially undercommercialized at the time of the sale. In a throw-away line in its reply brief, Anchor contends that evidence of industry norms was relevant to proof of damages under its expectancy damages theory.

An expectancy damages theory which would look to the difference between the revenue Narragansett falsely claimed to have been generating in July/August 1988, and the revenue that a station commercialized in accordance with industry norms would have been generating at that time, is not implausible. Indeed, it strikes us as being much more in line with the fraud damages to which Anchor actually was entitled under Rhode Island law than the "effect on the bid" theory pursued throughout this litigation. *See supra*

note 3. The problem is, however, that Anchor never sought to quantify its expectancy damages in this way *until* its reply brief. In fact, Anchor represented to the district court on at least three occasions that evidence of industry norms was *irrelevant* to its expectancy damages theory. *See* Second Trial Transcript, 3/29/94, at 13 (two representations to this effect), and 3/30/94 at 18. Instead, Anchor sought to quantify its expectancy damages as the difference between the actual 1988 revenues generated by the overcommercialized KOVR (a fact of which it learned only *subsequent to* taking over the station), and the far lower revenues the false day-part summary indicated that KOVR was realizing. We discuss the legal viability of this quantification in the next section of our opinion; suffice it to say at this point that Anchor has waived any argument that evidence of industry norms was relevant to its expectancy damages theory. *See, e.g., Sandstrom v. Chemlawn Corp.,* 904 F.2d 83, 86 (1st Cir. 1990) (deeming waived an argument not made below or in appellant's opening brief).

second trial, necessarily subsumed within Anchor's alternative damages theory was a tacit argument—i.e., that Anchor expected to run the same number of commercials that Narragansett had been running at the relevant time in 1988—which was completely at odds with the stance Anchor had taken regarding 1988 commercialization levels.

The district court did not err in prohibiting Anchor from altering its litigation position in this way. It follows, therefore, that the court did not err in ruling that Anchor had failed to prove expectancy damages arising out of any fraudulent misrepresentation of commercialization levels by Narragansett or Pfeiffer. *See Campanelli*, 63 A.2d at 724 (proof of fraud includes proof of *damage-causing* reliance by plaintiff); *Cheetham*, 56 A.2d at 863 (purchaser defrauded to his/her *disadvantage* has fraud action under Rhode Island law).

### 3. The Political Advertising Allegation

Having granted Narragansett and Pfeiffer judgment as a matter of law on Anchor's contract and fraud claims based on the political advertising allegation during the first trial, the district court summarily [11] precluded Anchor from arguing at the second trial that Narragansett had artificially inflated 1988 revenues by overcharging political candidates for commercial time. Anchor assigns error *only* to this second trial ruling, arguing that it was improper unless "there is no theory of the facts under which the allegations of the complaint state a cause of action. *Vartanian v. Monsanto Co.*, 14 F.3d 697, 700 (1st Cir. 1994)." Anchor's argument completely overlooks the procedural posture of its political advertising allegation at the second trial.

■ Perhaps nothing better highlights Anchor's misapprehension of this issue than its citation to *Vartanian* as supporting authority. The above-quoted language from *Vartanian* summarizes the standard by which we review the propriety of the a district court's dismissal of a claim under Fed. R.Civ.P. 12(b)(6). The exclusion of the political advertising allegation at the second trial was *not*, however, a Rule 12(b)(6) dismissal. When the court ruled the allegation out of the second trial, Anchor had already been afforded a complete opportunity to substantiate and argue it, and the court had deemed it insufficient to go to a jury. Thus, despite Anchor's attempts to depict it otherwise, the court's exclusion of the political advertising allegation from the second trial was tantamount to a denial of a Fed.R.Civ.P. 60(b) motion to set aside a properly-entered prior order. *See* Fed.R.Civ.P. 60(b) (setting forth the circumstances in which a court may relieve a party or a party's representative from a final order).[12] And we review such denials only for an abuse of discretion. *See, e.g., de la Torre v. Continental Ins. Co.*, 15 F.3d 12, 14–15 (1st Cir.1994) (orders denying relief under Fed.R.Civ.P. 60(b)—which allows for "extraordinary relief" . . . "only under exceptional circumstances"—reviewed solely for an abuse of discretion) (citations omitted).

Because it failed to understand the procedural path it had to follow, Anchor did not present the trial court (and has not presented us) with an argument that a revival of its political advertising allegation was required under any of the criteria—e.g., mistake, inadvertence, surprise, excusable neglect, newly-discovered evidence, fraud, etc.—delineated in Rule 60(b). Instead, Anchor argues that, by the time of the second trial, it "had reconsidered its arguments on [the political advertising] issue and [had] marshalled new evidence in support of its claim." Plainly, this is an inadequate foundation upon which to premise a request for relief under Rule 60(b). *Cf. Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir.) ("Rothwell's brief is long on support for why summary judgment is not appropriate in light of all the evidence and legal arguments it now pres-

---

**11.** Prior to opening arguments in the second trial, the court stated that it was "likely" to rule out the allegation for the same reasons that it had ruled it out at the first trial. The next day, without elaborating, the court notified the parties that the allegation was indeed out of the case.

**12.** Apparently believing itself entitled to renew its political advertising allegation at the second trial as of right, Anchor never formally moved the court for relief from the prior order under Rule 60(b). Its arguments in support of its position were instead set forth in its opposition to Narragansett's pretrial motion *in limine* to exclude the allegation from the second trial.

ents, but short on explaining why Rothwell should be able to begin presenting those arguments—in waves—almost six weeks after the district court had already ruled against Rothwell."), *reh'g denied, opinion amended,* 835 F.2d 710 (7th Cir.1987). Furthermore, our own review of the record reveals no "exceptional circumstances" which would have made relitigation of the political advertising allegation appropriate. Accordingly, the district court acted well within its discretion in prohibiting Anchor from pursuing this allegation at the second trial.

### 4. Remaining Appellate Issues

 The four remaining arguments Anchor presses on appeal relate to decisions the district court made in connection with the ABC newsbrief allegation. *See supra* at 553–54. We need not and do not reach the merits of these arguments, because our review of the record compels us to conclude that, for an independent reason, Anchor's claims for breach of contract and fraud based on these claims were legally deficient. *See Alioto,* 26 F.3d at 204.[13]

As already explained, the essence of Anchor's ABC newsbrief allegation was that Narragansett fraudulently increased its cash flow in the months preceding the auction by running local commercials at a time when it was contractually obliged to be running an ABC newsbrief. Anchor quantified the damages arising out of this fraudulent conduct in accordance with its "effect on the bid" damages theory. *See supra* at 550–51. That is to say, Anchor argued that the proper measure of damages arising from this conduct was the amount of 1988 revenue generated by the improper practice times the multiplier (13.6) Anchor used in formulating its bid.

As the district court noted in granting Narragansett and Pfeiffer judgment as a matter of law after the jury verdict on the

fraud claim based on this allegation, *see supra* at 552 and note 13, the problem with this damages theory in context is that most, if not all, of the revenue at issue still would have been generated in the absence of the alleged fraud. Anchor's own damages witness, Martin Ross, admitted: (1) few, if any, local commercials are sold to run at a specific point in time; (2) most local commercials are "preemptable" (i.e., able to be run, in the station's discretion, outside of the general time frame for which they have been sold); and (3) on a given day, "there's probably always going to be some commercial availability." Moreover, Mr. Ross conceded that Anchor had failed to go through KOVR's 1988 program logs and determine which of the improperly-run commercials could not have been run elsewhere, thus generating irreplaceable revenue.

Anchor does not dispute any of this. In fact, it appears to recognize that its bid was not actually affected by fraud in connection with the ABC newsbrief (and any concomitant breach of the Agreement such fraud would have engendered) except to the extent that the fraud generated *irreplaceable* revenue. Anchor argues, however, that, in order to prove its damages, all it had to do was quantify Narragansett's ill-gotten revenue. In its view, once it had quantified such revenue, it became Narragansett's and Pfeiffer's burden to prove the extent to which the revenue was replaceable (as part of their burden of proving failure to mitigate damages).

 This argument is unconvincing. The law does not contemplate that a party victimized by fraud or breach of contract prove, without reference to the rest of the record, the narrow effects of the fraud or breach; it requires that party to prove, *as an element of its case,* the extent to which it was *damaged* by the fraud or breach. In the face of the uncontroverted evidence showing that

---

13. While we do not address the merits of Anchor's argument that the court was without the power to grant judgment as a matter of law to Narragansett and Pfeiffer on the one issue that went to the jury *after* the jury had returned a verdict in their favor, we do note that this type of order is utterly superfluous. The beneficiary of a jury verdict may, after all, always assert on appeal (as an alternative basis for upholding the verdict) a properly preserved argument that the

claim underlying the verdict was legally deficient. And we, of course, would review such a legal argument *de novo*—i.e., without deference to the trial court's opinion as to its merits. Thus, there is no practical reason for the court to resolve a reserved motion for judgment as a matter of law where the jury has found in favor of the party or parties who initially filed the motion.

KOVR still would have generated most of the revenues it obtained by running local commercials when it should have been running the ABC newsbrief, it is apparent that Anchor, by proving only the amount of revenue traceable to the improper practice, failed to provide the jury with a basis upon which to premise a reasoned *damages* finding. Thus, Anchor failed to prove an element of its case.

While ingenious, it is incorrect to suggest that Narragansett and Pfeiffer bore the burden of proving the extent to which the ill-gotten income was replaceable as part of their duty to prove failure to mitigate damages. The doctrine of mitigation of damages imposes on a party injured by either a breach of contract or a tort the duty to exercise reasonable diligence and ordinary care in attempting to minimize its damages. *Black's Law Dictionary* 1002 (6th ed. 1990). The doctrine thus *presupposes,* as a threshold matter, the existence of a causal nexus between the damages sought and the breach or tort, looking at whether and to what extent an intervening cause (i.e., a plaintiff's own negligence) may have contributed to these damages. Here, the question is not whether and to what extent Anchor's own conduct contributed to its damages; it is, rather, the threshold question of whether the damages Anchor sought were caused by the conduct of which Anchor complained. Accordingly, the doctrine of mitigation of damages is completely inapposite.

In sum, we think it clear that Anchor's contract and fraud claims based on the ABC newsbrief allegation were deficient because of an absence of proof of damages. We therefore reject Anchor's remaining appellate arguments, all of which pertain to the district court's handling of these claims.

## IV.

### CONCLUSION

For the reasons stated above, the judgment of the district court is affirmed in all respects.

*Affirmed. Costs to appellees.*